UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| AMOS J. WELLS III, | § | |
| | § | |
| Petitioner, | § | |
| | § | |
| v. | § | |
| | § | Civil Action No. 4:21-CV-01384-O |
| BOBBY LUMPKIN, Director, Texas | § | |
| Department of Criminal Justice, | § | (Capital Case) |
| Correctional Institutions Division, | § | |
| | § | |
| Respondent. | § | |

<u>MEMORANDUM OPINION & ORDER</u>

Before the Court are Petitioner Amos J. Wells III's Amended Petition for Writ of Habeas Corpus (ECF No. 58), filed March 20, 2023; Petitioner Amos J. Wells III's Motion to Stay Proceedings (ECF No. 60), filed March 20, 2023; Respondent Bobby Lumpkin's Answer to the Amended Petition for Writ of Habeas Corpus (ECF No. 69), filed July 19, 2023; Respondent Bobby Lumpkin's Opposition to the Motion to Stay Proceedings (ECF No. 70), filed July 19, 2023; Petitioner Amos J. Wells III's Reply in Support of the Amended Petition for Writ of Habeas Corpus (ECF Nos. 80, 81), filed September 18, 2023; and Petitioner Amos J. Wells III's Reply in Support of the Motion to Stay Proceedings (ECF No. 79), filed September 18, 2023.

For the reasons set forth herein, the Court **DENIES** the Amended Petition for Writ of Habeas Corpus, the Motion to Stay Proceedings, and the Certificate of Appealability.

## I.   BACKGROUND

### A.  CAPITAL MURDER OFFENSE[1]

On July 1, 2013, Petitioner became infuriated at Chanice Reed, his eight-month-pregnant girlfriend, for not answering his calls. So, Petitioner drove to Chanice's Fort Worth home where

---

[1] Unless noted otherwise, this section is a summary of the undisputed facts expounded upon in detail in the Texas Court of Criminal Appeals' opinion affirming Petitioner Amos J. Wells III's conviction and sentence

she resided with her grandmother, mother, and two younger brothers. When Petitioner arrived at the Reed household, Chanice was home with Annette Reed, her mother, and E.M., her ten-year-old little brother. K.S., Chanice's seventeen-year-old brother, was not at home at the time. However, while on the phone with his mother to seek her permission to go swimming, K.S. overheard Chanice and Petitioner verbally quarreling. Specifically, K.S. overheard Chanice utter: "Stop, Amos, you're scaring me." K.S. was also able to hear Annette raising her voice at Petitioner before hanging up on the mother-and-son phone call.

Not long afterward, Annette placed a phone call asking Joylene Parsons, her aunt, to come over to the Reed home. According to Parsons, Annette sounded extraordinarily troubled. Parsons also described overhearing a man unleashing a "bone-chilling scream" at the top of his lungs in the background of the call. After hearing Annette say, "You not going in there," Parsons asked who else was at the Reed home. Annette replied with "Chanice's boyfriend." Parsons understood that Annette was referring to Petitioner. Annette subsequently stated that "[Chanice] got to be the stupidest bitch to open the door to let that fool in," and to "Come on, come on." Parsons immediately called nearby family members and 9-1-1 for help. While the 9-1-1 operator was in the middle of asking questions, Annette reported "He's going to his truck," before her line on the call suddenly went dead.

A bystander was working on a driveway down the street from the Reed household. He heard the commotion and watched as a man and a woman argued loudly in the Reed's front yard. The bystander testified that the argument began to escalate in intensity. He saw the man retrieve a handgun from a Chevrolet Tahoe parked in front of the Reed home, return back to the front yard, and proceed to aim and fire the handgun directly at the woman multiple times from point-blank

---

on direct appeal. *See Wells v. State*, 611 S.W.3d 396 (Tex. Crim. App. 2020).

range as she cried out in desperation: "No, no, no." According to the bystander, another woman approached, urgently attempting to deflect or disarm the man of his handgun. Without hesitation, the man proceeded to aim and fire the handgun directly at the second woman multiple times from point-blank range as well. Hearing the blaze of yet even more gunshots, the bystander remained hidden by his house until the perpetrator drove off in the Tahoe. He subsequently went into the Reed home and observed a woman, later identified as Chanice, lying outside the front door with her eyes open. Chanice was profusely bleeding and completely unresponsive.

### 1.  The Murders

First responders arrived within minutes of the first 9-1-1 report of the shootings. They discovered that Chanice with four gunshots to her pregnant body. One round pierced her skull right in between her eyes and cut its way through the right side of her brain. A second round punctured her lower chest. A third round burst into Chanice's pregnancy-stretched left abdomen, inflicting irreversible damage by tearing through her lungs, stomach, aorta, and thoracic spine. The fourth round penetrated Chanice's back through her left side, ripping open a superficial gunshot wound. First responders at the scene, including emergency paramedics, were unable to save or revive Chanice's life. Chanice's unborn baby was also unable to be saved and perished along with his mother. Post-mortem testing revealed that Petitioner was the biological father of the slain child.

Chanice's mother Annette suffered two fatal gunshots to her head. One large-caliber bullet drilled right into her mid-forehead, severing her anterior cerebral artery supplying blood to the brain and eventually depositing at the base of her ruptured brain. The second bullet scalped Annette from above her right ear, shredding more of her brain and crumbling down her left eye socket and eyeball with it. Early responders to the scene found Annette still alive as she was on the ground

and helplessly shrieking. Chanice's mother would suffer the same fate as Chanice shortly thereafter at the hospital.

Chanice's little brother E.M. suffered four gunshot wounds to his ten-year-old body. The child's slain body had been found in a hallway inside of the actual residence. One shot blistered through his right ear, rattled down his neck on the right side, lacerated his left subclavian vein and lung, and then ejected out through his back. A second shot was lodged into the front of his chest, puncturing the lower pericardial sac of E.M.'s heart and slashing through his diaphragm, liver, and interior vena cava carrying blood to his heart, cutting further through his lung and rib thereafter, and finally bursting back out of the juvenile's body through his back. A third shot again perforated the front of his chest—this time blazing through E.M.'s stomach, colon, mesentery, and left iliopsoas muscle before erupting back out from the child's back. The fourth gunshot scorched through E.M.'s left forearm from back to front.

### 2.  The Investigation and Arrest

All the cartridge casings recovered at the scene were of the same .9-millimeter caliber and brand. It was later confirmed that they had all been fired from the same weapon. Based on statements from witnesses and family members collected at the scene of this killing spree, law enforcement focused their investigation on Petitioner as the main suspect. In the meantime, Petitioner called Valricia Brooks, a former girlfriend who shared a daughter with Petitioner, and told her what transpired. He confessed to her that he had shot and killed Chanice, Annette, and E.M. and that he was considering fleeing. Petitioner's brother, Amron Wells, eventually joined the call with Petitioner and Brooks. Petitioner also informed his brother of the killings. Petitioner indicated his intent to drive off somewhere to commit suicide and asked Amron to care for his

daughter for him. Brooks arranged a phone call between Petitioner and his daughter and subsequently advised Petitioner to turn himself in to the authorities.

Later that evening, Petitioner walked into the Forest Hills Police Department lobby and, in a rambling and incoherent manner, blurted, "Put me in jail; kill me." Sergeant Christopher Hebert noted that Petitioner was a "sweaty, big guy, muscular, [and] had a dazed kind of spacey look on him." Sergeant Hebert handcuffed Petitioner as a safety precaution. He further described Petitioner's demeanor as being "like a calm storm . . . calm demeanor but aggressive," and "look[ing] like he could [] explode any second." Fort Worth officers then transported Petitioner to a Fort Worth police station, where Detectives Matthew Barron and Tim O'Brien attempted to interview Petitioner that night. Without reading *Miranda* warnings, Detective Barron began by asking Petitioner routine intake questions, i.e., name, date of birth, and address. Petitioner voluntarily answered these questions. Detective Barron followed up by inquiring: what Petitioner had done that day; why Petitioner showed up at the Forest Hills police station; whether Petitioner had been on the street where the Reed family resided; and what had happened on the street where the Reed family resided. Petitioner denied being present on that street that day. When Detective Barron asked Petitioner to tell him what had happened on that street, Petitioner repeatedly answered, "You tell me what happened."

Having not acquired useful information after forty or so minutes of questioning and an eight-minute break, the detectives ceased their interview of Petitioner and shifted gears toward interviewing others who were asked to give statements at the station. Slightly past midnight, Detective Barron made a determination that the authorities had probable cause to arrest Petitioner and search Petitioner's residence. Detective Barron obtained and executed a search warrant at Petitioner's residence during the early morning hours of July 2, 2013. The search turned up an

undegraded empty cardboard .9 millimeter ammunition box; an opened .9 millimeter ammunition box containing 38/50 unspent cartridges matching the casings found at the crime scene; a gun magazine loaded with thirteen .9 millimeter rounds; an otherwise empty plastic handgun case that contained a single unspent .9 millimeter round; and a home security system control box containing time-stamped videos, which depicted Petitioner backing out of the driveway alone in his Tahoe shortly before the offense on July 1, and Petitioner's brother pulling into the driveway alone in the Tahoe later that same night.

Upon completion of the search, Detective Barron obtained an arrest warrant later that morning and returned to Petitioner's interview room to inform him that he was being charged with capital murder. Detective Barron proceeded to issue the standard *Miranda* warnings to which Petitioner waived his rights in response. Detective Barron re-interviewed Petitioner, which consummated in Petitioner breaking down crying and confessing in detail to the murders of Chanice, Annette, and E.M. on July 1, 2013.

### 3. The Indictment

On September 16, 2013, a Tarrant County grand jury indicted Petitioner on three counts of capital murder, to wit: intentionally and knowingly shooting Chanice and her mother Annette during the course of the same criminal episode; intentionally and knowingly shooting Chanice and her brother E.M. during the same criminal episode; and intentionally and knowingly shooting E.M. and his mother Annette during the same criminal episode.[2] Petitioner's original indictment included a deadly weapon allegation. On March 6, 2015, Petitioner was re-indicted on a single count of capital murder, to wit, intentionally and knowingly shooting Chanice and her mother

---

[2] ECF No. 73-5, 37-38.

Annette during the same criminal episode, with a second paragraph containing a deadly weapon allegation.[3]

## B. CAPITAL MURDER PROCEEDINGS

Petitioner's capital murder trial commenced on October 31, 2016. In addition to the evidence summarized above, the prosecution presented testimony from the medical examiners who conducted the autopsies on Petitioner's three victims. Petitioner did not testify at the guilt-innocence phase of trial and advised his trial counsel on the record that he did not wish them to call any other witnesses or offer any evidence.[4] On November 3, 2016, at the conclusion of the evidence on guilt-innocence, the jury found Petitioner guilty beyond a reasonable doubt of capital murder as charged in the indictment.[5] *See* TEX. PENAL CODE § 19.03(a)(7)(A).

The punishment phase of Petitioner's trial commenced on November 4, 2016. The prosecution presented testimony and other evidence showing that: (1) on multiple occasions Petitioner assaulted a prior romantic partner, Valricia Brooks, who was also the mother of his child; (2) on multiple occasions prior to the date of the fatal shootings, Petitioner behaved violently toward Chanice Reed; and (3) while awaiting trial for capital murder, Petitioner assaulted another inmate at the Tarrant County Jail.

Trial counsel for Petitioner presented extensive testimony from Petitioner's parents, family, and mental health experts showing that: (1) Petitioner endured a violent, unstable, emotionally abusive family life during his upbringing; (2) Petitioner was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") as a child, for which he was prescribed medication; (3) Petitioner's mother suffered from personality disorders that left her incapable of distinguishing

---

[3] ECF No. 73-5, 18-19.
[4] ECF No. 74-33; 36 R.R. 12-18.
[5] ECF Nos. 73-5, 74-36; 1 C.R.T. 713; 33 R.R. 58-61.

right from wrong; and (4) Petitioner's biological father displayed a lack of personal and financial responsibility. The defense also presented extensive expert testimony showing that Petitioner was genetically predisposed to violence. Petitioner's trial counsel contended that this made Petitioner less morally culpable for his own acts of violence.

Finally, Petitioner himself took the stand during the punishment phase of trial and testified that: (1) he had participated in counseling sessions to address his violent acts toward Brooks and Reed; (2) he had no recollection of shooting any of his victims; (3) he had a long history of difficulty controlling his emotions, particularly when angry; and (4) he was sincerely remorseful for his offenses.

On November 18, 2016, the jury returned its punishment phase verdict and found: (1) beyond a reasonable doubt that there was a probability Petitioner would commit criminal acts of violence constituting a continuing threat to society; and (2) there were insufficient mitigating circumstances warranting the imposition of a sentence of life imprisonment without the possibility of parole.[6] The trial court entered judgment and imposed a sentence of death.[7] *See* TEX. PENAL CODE §§ 19.03(a)(7), 19.02(b)(1).

### C. DIRECT APPEAL

Petitioner directly appealed his conviction and sentence. Attorney John Stickels filed the Appellant's Brief for Petitioner on May 13, 2018. In it, appellate counsel argued thirteen points of error challenging the decisions rendered by the state trial court.[8] The Texas Court of Criminal Appeals unanimously affirmed the judgment of the state trial court convicting Petitioner of capital

---

[6] ECF Nos. 73-6, 267; 2 C.R.T. 756; 45 R.R. 50-195.
[7] ECF No. 73-6; 2 C.R.T. 763-65, 777-90.
[8] ECF No. 73-2.

murder and sentencing Petitioner to capital punishment. *Wells*, 611 S.W.3d at 430.[9]

### D.  STATE HABEAS CORPUS PROCEEDINGS

On April 18, 2019, Petitioner applied for state habeas corpus relief. Attorneys Benjamin Wolff, Ashley R. Steele, and Michelle Ward, all associated with the Texas Office of Capital and Forensic Writs, filed Petitioner's 400-plus page state habeas corpus application with voluminous exhibits accompanying the same.[10] The application was also accompanied by several thousand pages of exhibits, including thousands of pages of sealed medical, mental health, and school records.[11] Petitioner raised nine claims for habeas corpus relief in the state post-conviction process.

The state habeas trial court did not hold an evidentiary hearing. Instead, it directed the parties to file affidavits with proposed findings of fact and conclusions of law. Upon review, the state habeas trial court adopted with only minor modifications the proposed findings of fact and conclusions of law submitted by the State.[12] In its findings and conclusions, the court found credible and relied heavily on the affidavits furnished by trial counsel for Petitioner, i.e., attorneys Bill Ray and Stephen Gordon.[13] The Texas Court of Criminal Appeals denied state habeas relief on the merits, expressly adopting all but one of the trial court's factual findings and conclusions of law. *See Ex parte Wells*, WR-86,184-01, 2021 WL 5917724 (Tex. Crim. App. Dec. 15, 2021).[14]

On May 16, 2022, the Supreme Court of the United States denied Petitioner's certiorari petition. *Wells v. Texas*, 142 S. Ct. 2722 (2022).

---

[9] *See also* ECF No. 73-32.

[10] *See* ECF Nos. 76-16, 76-10, 76-11, 76-13, 76-12.

[11] *See* ECF Nos. 78-1 to 78-13.

[12] *Compare* State's Proposed Findings of Fact and Conclusions of Law, ECF No. 76-19, 20; 2 S.H.C.R. 409-500, 503-44, *with* August 10, 2021 Order of State Habeas Court, ECF No. 76-20; 2 S.H.C.R. 656-57.

[13] *See* ECF No. 78-13, 189-207, 327-33; 3 S.H.C.R. 2689-3707 (Affidavit of Attorney Ray); 3 S.H.C.R. 2827-55 (Affidavit of Attorney Gordon).

[14] *See also* ECF No. 76-17.

## II.    LEGAL STANDARD

"Federal habeas features an intricate procedural blend of statutory and caselaw authority." *Adekeye v. Davis*, 938 F.3d 678, 682 (5th Cir. 2019). The blend largely consists of the two core strictures codified under the Antiterrorism and Effective Death Penalty Act ("AEDPA"). 28 U.S.C. § 2254. First, AEDPA requires a petitioner to "exhaust[] the remedies available in the courts of the State" before seeking federal habeas relief. § 2254(b)(1)(A). Ordinarily, a petitioner satisfies this exhaustion requirement by raising his federal claim before the state courts, per state procedures. *See O'Sullivan v. Boerckel*, 526 U.S. 838, 848 (1999).

Second, AEDPA requires a petitioner to show that the state court decision was either: (1) "contrary to, or involved an unreasonable application of" clearly established federal law; or (2) rested "on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." § 2254(d); *Brown v. Davenport*, 596 U.S. 118, 135 (2022).

(1) With respect to applying clearly established federal law, a state court decision is "contrary to" clearly established federal law if the state court: (i) arrives at a conclusion opposite to that reached by the Supreme Court on a question of law; or (ii) decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Brown v. Payton*, 544 U.S. 133, 141 (2005). A state court decision "unreasonably applies" clearly established federal law to the facts of the petitioner's case if the application (iii) is objectively unreasonable rather than merely incorrect or erroneous. *McDaniel v. Brown*, 558 U.S. 120, 132–33 (2010). Legal principles are "clearly established" when Supreme Court precedents, existing at the time of the state court decision, establish those principles. *Brown*, 142 S. Ct. at 1525.

(2) With respect to determining facts from the evidence, a state court finding is presumed reasonable unless the petitioner demonstrates by clear and convincing evidence that it is erroneous.

10

*Miller-El v. Dretke*, 545 U.S. 231, 240 (2005). "[A] state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance." *Wood v. Allen*, 558 U.S. 290, 301 (2010). Nor is a factual determination unreasonable merely because reasonable minds reviewing the record might disagree about the factual finding or the implicit credibility determination underlying the factual finding. *Id.*

In addition to the onerous thresholds erected by AEDPA, the petitioner must also persuade that the state court's error during adjudication of the petitioner's criminal case was not harmless. *Brown*, 142 S. Ct. at 1517. To do so, the petitioner must show that the error had a "substantial and injurious effect or influence" on the verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 622 (1993). If, however, the state court fails to adjudicate a claim on the merits that the petitioner presents to this Court, that claim will receive *de novo* review. *See Porter v. McCollum*, 558 U.S. 30, 39 (2009).

Under *Teague* non-retroactivity, a federal habeas court is barred from applying a new rule of federal constitutional criminal procedure retroactively on collateral review. *See Caspari v. Bohlen*, 510 U.S. 383, 389-390 (1994) (citing *Teague v. Lane*, 489 U.S. 288 (1989)). A court applies a "new rule" of criminal procedure in a case if "the result was not *dictated* by precedent existing at the time the defendant's conviction became final." *Teague*, 489 U.S. at 301 (emphasis in original). This includes a holding that either "breaks new ground" or "imposes a new obligation on the States or the Federal Government." *O'Dell v. Netherland*, 521 U.S. 151, 156 (1997) (cleaned up). *Teague* precludes a federal habeas court from ruling in favor of the petitioner's claim on collateral review unless a state court hearing the same claim at the time of the petitioner's final conviction "would have felt compelled by existing precedent to conclude that the rule [the petitioner] seeks was required by the Constitution." *Saffle v. Parks*, 494 U.S. 484, 488 (1990).

A petitioner's conviction becomes final under *Teague* when the availability of direct appeal

11

to the state courts has been exhausted and either the time for filing a certiorari petition with the U.S. Supreme Court has elapsed or the U.S. Supreme Court has issued a final denial of a timely filed certiorari petition. *Caspari*, 510 U.S. at 390. Notwithstanding the enactment of AEDPA, federal habeas courts remain bound to apply *Teague* in collateral review proceedings. *See Horn v. Banks*, 536 U.S. 266, 268-72 (2002); *Robertson v. Cockrell*, 325 F.3d 243, 255 (5th Cir. 2003).

### III.   ANALYSIS

Three matters are ripe for the Court's review: (A) the Amended Petition for Writ of Habeas Corpus; (B) the Motion to Stay Proceedings; and (C) the Certificate of Appealability. The Court proceeds by addressing each in turn.

### A. PETITION FOR WRIT OF HABEAS CORPUS

Petitioner raises nine claims in support of his Amended Petition for a writ of habeas corpus: (1) unconstitutional exclusion of video mitigation evidence under the Eighth and Fourteenth Amendments; (2) ineffective assistance of trial counsel in violation of the Sixth and Fourteenth Amendments for failing to present a cogent mitigation case and rebut *mens rea*, and for seating a partial juror; (3) ineffective assistance of trial counsel and state habeas counsel for failing to have the full video of an exhibit admitted into the record; (4) ineffective assistance of appellate counsel for failing to timely address exclusion of video evidence; (5) ineffective assistance of trial counsel for using racially charged remarks; (6) deprivation of due process of law under the Fourteenth Amendment from prosecutorial misconduct; (7) deprivation of due process of law for the presentation of genetic evidence; (8) the unconstitutionality of the state capital sentencing and post-conviction relief system; and (9) the unconstitutionally of capital punishment.

Addressing each in turn, the Court **DENIES** all nine of Petitioner's claims as well as all additional prayers for relief provided in the Amended Petition.

### 1. Constitutionality of Evidence Exclusion at Capital Sentencing (Claim One)

Petitioner first claims that the state trial court violated the Eighth and Fourteenth Amendments to the Constitution by excluding Defendant's Exhibits 81A, 82A, 83A, and 84A.[15] Specifically, Petitioner contends that the exclusion of the four videos contained within Defendant's Exhibits 81A-84A violated his constitutional rights to present mitigating evidence during capital sentencing proceedings under *Lockett v. Ohio*, 438 U.S. 586 (1978).

Defendant's Exhibit 81A is a police interrogation room recording of Petitioner within hours of turning himself in. Petitioner asserts that it depicts him crying, disoriented, confused, and docile and respectful to law enforcement. Defendant's Exhibits 82A, 83A, and 84A consist of three video-recorded interviews between Petitioner and local media. In a similar light, Petitioner asserts that these recordings depict him crying and apologizing for killing his pregnant girlfriend and unborn child, his girlfriend's mother, and his girlfriend's ten-year-old little brother.

But after reviewing this first constitutional claim for habeas corpus relief under a *de novo* standard, the Court finds it utterly lacking any serious merit.

#### i.  Legal Standard

The Supreme Court plurality in *Lockett v. Ohio* held that a jury cannot be precluded from considering as a mitigating factor "any aspect of a defendant's character or record and any circumstance of the offense that the defendant proffers as a basis for a sentence less than death." 438 U.S. 586, 604 (1978). On the other hand, a trial court retains its inherent authority "to exclude, as irrelevant, evidence not bearing on the defendant's character, prior record, or the circumstances of his offense." *Id.* at 604 n.12. While the Supreme Court has since held that a jury cannot be precluded from considering relevant mitigating evidence, *Skipper v. South Carolina*, 476 U.S. 1,

---

[15] Amend. Pet. at 9-40.

4 (1986), it has also clarified that "gravity has a place in the relevance analysis, insofar as a trivial feature of the defendant's character or the circumstances of the crime is unlikely to have any tendency to mitigate the defendant's culpability." *Tennard v. Dretke*, 542 U.S. 274, 286 (2004). As such, not all purportedly mitigating evidence is relevant and therefore mandatory for a jury to consider. *See Bigby v. Stephens*, 595 F. App'x 350, 353 (5th Cir. 2014).

Supreme Court precedents confers upon a criminal defendant "the right to present sentencers with information relevant to the sentencing decision and oblige sentencers to consider that information in determining the appropriate sentence." *Kansas v. Marsh*, 548 U.S. 163, 175 (2006). But "[t]he thrust of [the Supreme Court's] mitigation jurisprudence ends here." *Id.* For the *Lockett* decision and its progeny "stand only for the proposition that a State may not cut off in an absolute manner the presentation of mitigating evidence." *Johnson v. Texas*, 509 U.S. 350, 361 (1993) (cleaned up). Conversely, the incorporated Eighth Amendment "does not deprive the State of its authority to set reasonable limits upon the evidence a defendant can submit, and to control the manner in which it is submitted." *Oregon v. Guzek*, 546 U.S. 517, 526 (2006); *see, e.g.*, *Johnson*, 509 U.S. at 362; *Buchanan v. Angelone*, 103 F.3d 344, 349 (4th Cir. 1996) (holding that a trial court's exclusion of evidence pursuant to a state hearsay rule did not violate the constitution because "the statements would have had only cumulative probative value").

Furthermore, a trial court's decision to exclude relevant mitigating evidence is subject to harmless error review. *Rhoades v. Davis*, 914 F.3d 357, 367-69 (5th Cir. 2019). Thus, in order to succeed on a mitigating evidence exclusion claim, a petitioner must demonstrate to the federal habeas court that the alleged error had a "substantial and injurious effect or influence" on the outcome of the petitioner's criminal trial. *Brecht v. Abrahamson*, 507 U.S. 619, 637-38 (1993).

ii.    Exclusion of Defendant's Exhibits 81A-84A

14

At the outset, Defendant's Exhibits 82A–84A were properly excluded for being littered with hearsay in Petitioner's statements, media reporters' commentary, victims' family statements, and a neighbor's commentary regarding the murders. *See Simmons v. Epps*, 654 F.3d 526, 542-44 (5th Cir. 2011) (holding that the state court's decision to exclude for hearsay purportedly mitigating videotape evidence was not unreasonable). Petitioner did not offer versions of these videotape exhibits that omitted the hearsay contained therein.[16] The state trial court was therefore correct in concluding that Defendant's Exhibits 82A-84A were excludable. *See* Tex. R. Evid. 801.

Relying on the Supreme Court's decision in *Green v. Georgia*, 442 U.S. 95 (1979), Petitioner retorts that "evidentiary rules cannot be applied 'mechanistically to defeat the ends of justice." But the Fifth Circuit has recognized that the reach of *Green* is actually "quite limited." *Simmons*, 654 F.3d at 543. It certainly does not reach the excluded evidence at issue here. Unlike in *Green*, where the trial court excluded evidence that another person confessed to the crime, the "probative value of" Defendant's Exhibits 82A-84A excluded in this case "pales in comparison." *Id.* Petitioner's jailhouse interviews with local media lack substantial indicia of reliability. *See id.* As the Fifth Circuit panel in *Simmons* noted in its decision to uphold the exclusion of a videotape created by a petitioner expressing remorse, Petitioner's expression of remorse "was less of a statement against interest, because [Petitioner] did not directly confess to the crime and may have had ulterior motives to create the tape." *Id.* at 544. Neither were Petitioner's media hits the sole avenue for him to proffer evidence of remorse, as himself and other defense witnesses testified at great length to Petitioner's remorsefulness. *See id.* Consequently, Petitioner fails to demonstrate that the state trial court improperly excluded Defendant's Exhibits 82A-84A.

As for Defendant's Exhibit 81A, Petitioner argues that it was improper for the state trial

---

[16] See 45 R.R. 21-24.

court to "exclude the recording of [Petitioner] while not being interviewed but being detained at the Fort Worth Police Department contained in the Defendant's Exhibit [81A]."[17] Petitioner maintains that the entire six-hour segment between jailhouse interviews should have been admitted because it was relevant mitigating evidence of his mental condition briefly after committing the murder spree. The Court disagrees and finds that the state trial court's decision to exclude the contested six-hour segment of the 81A videotape, along with the entirety of the 82A-84A videotapes, was harmless.

Petitioner did not raise the argument during trial that Defendant's Exhibits 81A-84A were admissible to show remorsefulness, and therefore forfeited any such argument to begin with. In the State of Texas, a specific articulation of the legal basis of an evidentiary proffer is necessary to preserve error. *See Golliday v. State*, 560 S.W.3d 664, 669-70 (Tex. Crim. App. 2018). On direct appeal, the state appellate court found that Petitioner failed preserve this claim. *Wells*, 611 S.W.3d at 422 (citing Tex. R. App. P. 33.1). In the context of this federal habeas proceeding, even on *de novo* review, the Court is bound to accept this finding as a matter of state law. *See Buntion v. Lumpkin*, 982 F.3d 945, 951 (5th Cir. 2020) (expounding that "a basic tent of federal habeas review is that a federal court does not have license to question a state court's finding of procedural default . . . based upon an adequate and independent state ground." (cleaned up)); *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (per curiam) ("We have repeatedly held that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus."). The state appellate court's finding constitutes an independent and adequate bar to Petitioner's claim in this Court that the excluded portions of Defendant's Exhibits 81A-84A prevented Petitioner from presenting mitigating evidence of his remorse. *See Scheanette*

---

[17] 45 R.R. 20.

*v. Quarterman*, 482 F.3d 815, 823 (5th Cir. 2007). Petitioner makes no effort to rebut Fifth Circuit precedent holding that Texas' contemporaneous objection rule constitutes an independent and adequate state ground for precluding his claim. *See Scheanette*, 482 F.3d at 823.

Accordingly, the Court holds that this claim does not entitle Petitioner to habeas relief from his conviction and sentence and should therefore be **DENIED**.

### 2.  Due Process of Law Deprivation by Prosecutorial Misconduct (Claim Six)

Petitioner's sixth claim alleges that the prosecution for the People of the State of Texas deprived him of due process of law guaranteed under the Fourteenth Amendment.[18] In support of this prosecutorial misconduct claim, Petitioner specifically asserts that in closing arguments to the jury during the punishment phase of trial, the state's representatives knowingly made: false statements regarding Petitioner's lack of remorse by arguing that Petitioner "never shed a tear" over the murders; and misleading discussion of the incident where Regin Hooks stabbed Petitioner by arguing that Petitioner was the aggressor. The Court is firmly unpersuaded by any of this.

###### i.   Legal Standard

To successfully make out a due process of law deprivation in this context, the petitioner must first establish that the prosecution's argument was improper. *See Watts v. Quarterman*, 448 F. Supp. 2d 786, 814-15 (W.D. Tex. 2006) (collecting cases). A proper prosecutorial jury argument consists of either: (1) a summation of the evidence; (2) a reasonable deduction from the evidence; (3) a response to an opponent's argument; or (4) a plea for law enforcement. *Hughes v. Quarterman*, 530 F.3d 336, 347 (5th Cir. 2008); *Ward v. Dretke*, 420 F.3d 479, 497 (5th Cir. 2005). During closing arguments in particular, the prosecution "is not prohibited from reciting to the jury those inferences and conclusions she wishes the jury to draw from the evidence so long as those

---

[18] Amend. Pet. at 107-09.

17

inferences are grounded upon evidence." *Dowthitt v. Johnson*, 230 F.3d 733, 755 (5th Cir. 2000) (cleaned up). Rather, a prosecutorial remark is reasonable and within constitutional boundaries for merely "requesting the jury to draw a desired conclusion based upon the evidence." *Id.*

But even if the petitioner identifies certain improper remarks elicited by the prosecution, the fact that the remarks "were undesirable or even universally condemned" is insufficient on its own to establish a constitutional violation. *Darden v. Wainwright*, 477 U.S. 168, 181 (1986) (cleaned up). The dispositive inquiry is "whether the prosecutors' comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Id.* (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)); *see Parker v. Matthews*, 567 U.S. 37, 45 (2012) (per curiam). To clear the persuasive hurdle of prejudice rendering a trial fundamentally unfair, Petitioner bears the burden of showing that the prosecution's remarks "evince either persistent and pronounced misconduct or . . . the evidence was so insubstantial" that a conviction would not have resulted but for the remarks. *Harris v. Cockrell*, 313 F.3d 238, 245 (5th Cir. 2002) (cleaned up). Supreme Court precedent further dictates that a writ of habeas corpus shall not warrant based on a mere trial error unless the alleged error had a "substantial and injurious effect or influence" on the verdict issued against the petitioner. *Brecht*, 507 U.S. at 637.

Even under a *de novo* standard of review, Petitioner falls well short of his persuasive hurdle on this constitutional due process claim.

      ii.   <u>Statements on Lack of Remorse</u>

Petitioner's first allegation in support of this claim is that during the punishment phase of trial, the prosecution falsely asserted in closing arguments that Petitioner "never shed a tear, not a single tear" in his testimony about personally seeing the victims' dead bodies at the scene of the

murder spree.[19]

But the Court finds this portion of the prosecution's closing arguments to be wholly proper. For the reference to Petitioner's failure to "shed a tear" was a mere reminder to the jury of Petitioner's *own* in-court testimony provided to the jury earlier in the trial. The prosecution here specifically referenced Petitioner's testimony in the punishment phase of the capital murder trial to support its argument that Petitioner lacked remorse for the murders. Based on the Court's review of the record containing Petitioner's punishment phase testimony, the prosecution's supporting reference to that testimony was an entirely fair and accurate "summation of the evidence." *Watts*, 448 F. Supp. 2d at 815-16. There is nothing in the record to suggest that Petitioner cried or otherwise shed a single tear while testifying directly before the jury about observing first-hand the slain bodies of his pregnant girlfriend Chanice, her mother Annette, and her younger brother E.M.[20]

Further than that, Petitioner's punishment phase testimony produced an exchange on cross-examination that affirmatively *supported* the closing argument on remorsefulness put forth by the prosecution:

Q. You know, you didn't cry a single time when you described shooting anybody.

A. You can – *you can say that*, but –

Q. Well, that's true. You didn't.

A. I was hurting. It's – *you can say that*.[21]

The record before the Court therefore indicates that the prosecution's lack-of-remorsefulness argument in reference to Petitioner's first-hand account of the murders merely "request[ed] the

---

[19] Amend. Pet. at 108 (citing 46 R.R. at 98:3-9).
[20] *See* 45 R.R. 50-194.
[21] 45 R.R. 162 (emphasis added).

jury to draw a desired conclusion based upon the evidence." *Dowthitt*, 230 F.3d at 755. As such, the Court finds this portion of the prosecution's closing argument to be in perfect harmony with the due process of law owed to Petitioner.

iii.     Discussion of the Hooks Incident

Petitioner's second allegation in support of this claim is that during the punishment phase of trial, the prosecution also misleadingly discussed in closing argument the incident where "[Petitioner] gets involved in an assault where Regin Hooks has enough of it, and she cuts him with a knife."[22] Specifically, Petitioner contends that the prosecution misleadingly asked "[w]hat was going on that this woman is so scared of [Petitioner] that she cuts him with a knife?" and misleadingly asserted that this incident "tells [the jury] how terrified she was of [Petitioner]."[23]

Here, Petitioner similarly fails to show how this portion of the closing arguments amounted to anything other than an entirely proper prosecutorial argument to address to a jury. In presenting this line of argument in its closing, the prosecution simply drew upon Petitioner's punishment phase testimony and other supporting evidence in the record. Earlier in the trial, Petitioner had briefly testified that Hooks was charged with aggravated assault with a deadly weapon for slashing him with a knife, but that Petitioner himself was not arrested because of the incident.[24] Petitioner was then questioned on cross-examination about the defense investigator's notes describing the same incident.[25] The notes stated that Hooks demanded compensation after engaging in sexual intercourse with Petitioner, to which Petitioner had refused. The notes also included a statement by Hooks that Petitioner had "'always been abusive'—beating on her."[26] Petitioner acknowledged

---

[22] Amend. Pet. at 108 (citing 46 R.R. at 87:4-9).
[23] Amend. Pet. at 108 (citing 46 R.R. at 87:6-8).
[24] 45 R.R. 85–86.
[25] 45 R.R. 150–52; S.X. 200.
[26] *Id.*

the notes indicating Hooks's report of his abuse, but denied ever actually abusing Hooks and further accused her of lying.[27] The prosecution pointed out on cross-examination that, contrary to the testimony of defense witnesses that Petitioner had an issue with controlling anger and violence, Petitioner was perfectly capable of controlling these impulses when Hooks cut him with a knife.[28] On top of this, the trial record was rife with evidence of Petitioner insistently denying nearly every assault and domestic abuse incident he allegedly committed, including those that Petitioner *himself* pleaded guilty to and were photographically documented.[29]

In light of this trial record, the above-referenced segment of the prosecution's closing argument at issue here constituted an appropriate recitation of the "inferences and conclusions [the prosecution] wishe[d] the jury to draw from the evidence" of Petitioner's pattern of violence and abuse toward women. *Dowthitt*, 230 F.3d at 755. In doing so, the argument itself made a perfectly "reasonable deduction from the evidence," as summarized above, that Petitioner had minimized, misled, or even lied about the extent of his abusive and violent behavior toward Hooks. *Hughes*, 530 F.3d at 347; *Watts*, 448 F. Supp. 2d at 814-16.

Neither does Petitioner have any legitimate basis for contending that his capital murder trial somehow became "fundamentally unfair" on account of the prosecution's closing argument on the Hooks incident. *Darden*, 477 U.S. at 178-183; *Brecht*, 507 U.S. at 637. For one thing, the jury was made aware of the fact that Hooks had been charged as a result of the slashing incident while Petitioner had not.[30] Moreover, well beyond Hooks's report of Petitioner's abuse, the jury was presented with other voluminous evidence of Petitioner's pattern of physical abuse toward his

---

[27] 45 R.R. 152.
[28] 45 R.R. 152–53.
[29] S.X. 180, 182, 185–186, 189–92.
[30] 45 R.R. 86.

21

girlfriends that was far more detrimental to Petitioner's case—including that his pattern of abuse ultimately culminated in the grisly killings of his pregnant girlfriend and unborn child, his girlfriend's mother, and his girlfriend's little brother. *See Wells*, 611 S.W.3d at 419-20. When juxtaposed against this mountain of aggravating evidence implicating Petitioner's domestic violence and abuse habits toward women, Petitioner cannot seriously contend that the brief prosecutorial commentary on the Hooks incident inflicted a "substantial and injurious effect or influence" on the jury's verdict sentencing him to death. *Brecht*, 507 U.S. at 637. As with the lack-of-remorsefulness argument, the Court similarly finds this portion of the prosecution's closing argument to be in perfect harmony with the due process of law owed to Petitioner.

Accordingly, the Court holds that this claim does not entitle Petitioner to habeas relief from his conviction and sentence and should therefore be **DENIED**.

### 3.  Due Process of Law Deprivation by Expert Trial Testimony (Claim Seven)

Petitioner's seventh constitutional claim postulates that trial counsel's presentation of and the prosecution's reliance on genetic evidence deprived him of his due process of law guarantee under the Fourteenth Amendment.[31] Specifically, Petitioner contends that the introduction of and reliance upon expert opinion testimony that Petitioner is genetically prone to violence constituted a violation of his right to receive a criminal sentence based on reliable information and not immutable genetic makeup. Upon a *de novo* review of Petitioner's seventh constitutional claim for relief, the Court finds it bordering on frivolous.

### i.      Reliable Information

Petitioner first argues the genetic evidence violated his due process right to be criminally

---

[31] Amend. Pet. at 109-13.

sentenced based on reliable information.[32] Petitioner relies on the Supreme Court's opinion in *Townsend v. Burke* for the proposition that a sentence cannot be based on inaccurate or unreliable information. 334 U.S. 736, 741 (1948). But that reliance is inapposite here. In *Townsend*, the Supreme Court found a defendant was deprived of due process of law where he was without counsel and the trial court predicated his sentencing on criminal charges for which he was found not guilty. *Id.* at 740-41. It is plainly obvious that trial counsel's calculated decision to present the genetic evidence in Petitioner's case bears no resemblance to the factual circumstances at play in *Townsend*. Here, the crux of Petitioner's claim is a belated disagreement with trial counsel's *strategy*. This is insufficient to show he was deprived of a fair sentencing process. *See United States ex rel. Welch v. Lane*, 738 F.2d 863, 864–65 (7th Cir. 1984) (a defendant has "a right to a fair sentencing *process*—one in which the court goes through a rational procedure of selecting a sentence based on relevant considerations and accurate information" (emphasis in original)).

Moreover, Petitioner fails to show Dr. Bernet's testimony was inaccurate or unreliable. For the same reasons that Petitioner fails to show that trial counsel was ineffective for presenting the genetic evidence, Petitioner cannot show that his sentence was based on unreliable information. *See State v. Yepez*, 483 P.3d 576, 584 (N.M. 2021) (holding that the trial court did not abuse its discretion in concluding that "the scientific findings of low-activity MAOA genotypes moderating the effects of childhood maltreatment to increase the likelihood of antisocial and aggressive behavior in males satisfied the *Daubert* reliability factors"); *People v. Adams*, 336 P.3d 1223, 1241-42 (describing testimony of a forensic psychologist that "it had recently been shown that there is a powerful association with severe antisocial behavior later in life when childhood maltreatment combines with the presence of an inherited type of gene, the 3-repeat allele MAOA

---

[32] Amend. Pet. at 109-10 (citing *Townsend v. Burke*, 334 U.S. 736, 741 (1948)).

gene"). Moreover, Dr. Bernet even conceded to the jury that not all studies confirmed the early research regarding the MAOA genetic variant.[33] Petitioner simply fails to show the jury sentenced him based on unreliable or false evidence. *See Renteria v. Davis*, 814 F. App'x 827, 833–34 (5th Cir. 2020) (finding *Townsend* inapplicable where a petitioner does not demonstrate that his sentence "was predicated on inaccurate information").

Petitioner's claim might also be understood to arise under the Eighth Amendment as incorporated through the Fourteenth. If such is the case, the Fifth Circuit expounded that where the Supreme Court has discussed the Eighth Amendment's heightened reliability requirement, "it is not talking about the appropriate sources for information introduced at sentencing or even, more generally, about the reliability of the evidence." *United States v. Fields*, 483 F.3d 313, 336 (5th Cir. 2007). Rather, it has instead focused on the necessity of delineating the types of offenses for which capital punishment is appropriate and the need for individualized sentencing. *Id.* To that end, "the need for greater reliability in the selection of an appropriate punishment entails *not* stricter evidentiary rules, but the assurance of 'individualized sentencing' once a defendant is eligible for the death penalty." *Id.* (emphasis in original) (citing *Woodson v. North Carolina*, 428 U.S. 280, 304 (1976)). Therefore, assuming *arguendo* that Petitioner has raised an incorporated Eighth Amendment claim here, he does not demonstrate how trial counsel's presentation of the genetic evidence contravened his constitutional safeguard against "cruel and unusual" punishment. U.S. CONST. AMEND. VIII.

As such, the Court finds no merit to this allegation in support of the due process claim.

ii.    Immutable Genetic Makeup

Petitioner also claims trial counsel's presentation of the genetic evidence violated his due

---

[33] 43 R.R. 104–05.

process right to not be criminally sentenced based on his immutable characteristics, i.e., his race and genetics.[34] Petitioner's reliance on *Buck v. Davis* is misguided, as the decision has no bearing on the due process attack advanced by Petitioner against trial counsel's presentation of Dr. Bernet's testimony. 580 U.S. 100 (2017). *Buck* involved an IAC challenge to trial counsel's actions, not a due process attack leveled against the fairness of the entire proceedings. *See id.* at 118. Furthermore, Petitioner's allegation boils down to nothing more than mere post-hoc disagreement with trial counsel's strategy, which does not equate to a deprivation of fair sentencing proceedings. *Lane*, 738 F.2d 863, 864-65. Petitioner's attempt to Monday morning quarterback his trial counsel is not a cognizable due process claim.

Assuming *arguendo* that the Court *has* been presented with a legitimate constitutional claim, the allegations underlying it are still groundless. For one, Petitioner fails to show he was harmed by the genetic evidence. Petitioner hangs his hat on mere juror declarations[35] that are inadmissible under the Federal Rules of Evidence. *See* FED. R. EVID. 606(b). Additionally, Petitioner's claim is barred by *Teague* non-retroactivity doctrine because no precedent constitutionally proscribes the presentation of genetic information along the same lines as what was presented to the jury here. The Court declines the invitation to announce a "new rule of constitutional law" for the sake of bailing Petitioner out of an otherwise fair capital sentencing. *Caspari*, 510 U.S. at 389-390; *Teague*, 489 U.S. at 301. Thus, the Court does not find any merit to this allegation underlying the due process claim, either.

Accordingly, the Court holds that this claim does not entitle Petitioner to habeas relief from his conviction and sentence and should therefore be **DENIED**.

---

[34] Amend. Pet. at 110-11 (citing *Buck v. Davis*, 580 U.S. 100, 123-25 (2017)).
[35] Pet. at 111–12.

**4.   Constitutionality of Capital Punishment & Post-Conviction System (Claim Eight)**

Petitioner raises an eighth claim for habeas relief that seeks to declare the entire system for capital sentencing and post-conviction relief in the State of Texas "unconstitutional under the Eighth and Fourteenth Amendments."[36] Petitioner puts forth a whole host of underlying challenges in support of this penultimate claim. The Court finds none of them remotely convincing.

i.   Capital Sentencing Special Issues

Under this umbrella, Petitioner first argues that key terms of the Texas capital sentencing special issues are unconstitutionally vague and unconstitutionally narrow the scope of mitigating evidence. *See* Tex. Code Crim. Proc. art. 37.071.[37] Specifically, Petitioner contends that the lack of statutory definitions for terms such as "probability" and "criminal acts of violence" make the future dangerousness special issue unconstitutionally vague, while the statutorily prescribed scope of evidence in the mitigation special issue—i.e., evidence "reducing the defendant's moral blameworthiness"—unconstitutionally precludes the sentencing authority's consideration of relevant mitigating evidence. Petitioner's state habeas petition raised IAC claims for trial and appellate counsel's failure to challenge the future dangerousness special issue and trial counsel's failure to challenge the mitigation special issue.[38] Petitioner did not otherwise raise constitutional challenges to these special issues as a separate standalone claim. According to Petitioner, it was objectively unreasonable and prejudicial for trial and appellate counsel to have conceded these issues, and the state habeas court's findings to the contrary were unreasonable or contrary to clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). The Court finds no merit to these assertions.

For starters, the Fifth Circuit has repeatedly rejected constitutional vagueness attacks on

---

[36] Amend. Pet. at 114-17.
[37] Amend. Pet. at 114-15.
[38] State Pet. at 327-28, 331, 349-350.

the future dangerousness special issue terms in Texas's capital sentencing scheme. *See, e.g.*, *Sprouse v. Stephens*, 748 F.3d at 622–23 (5th Cir. 2014) (denying a constitutional-vagueness challenge to the terms "probability," "criminal acts of violence," and "continuing threat to society" in the Texas capital sentencing charge); *Paredes v. Quarterman*, 574 F.3d 281, 294 (5th Cir. 2009) (holding that the terms "probability," "criminal acts of violence," and "continuing threat to society" were not unconstitutionally vague); *Turner v. Quarterman*, 481 F.3d 292, 299–300 (5th Cir. 2007) (rejecting claims that the terms "probability," "criminal acts of violence," and "continuing threat to society" were so vague as to preclude a capital sentencing jury's consideration of relevant mitigating evidence). Secondly, the Fifth Circuit has affirmed the constitutionality of the mitigation special issue in Texas's capital sentencing scheme. *See Hummel v. Davis*, 908 F.3d 987, 994 (5th Cir. 2018). So too, the Supreme Court specifically commended Texas's current capital sentencing scheme for its "brevity and clarity" and its inclusion of a "clearly drafted catchall instruction on mitigating evidence." *Penry v. Johnson*, 532 U.S. 782, 802–03 (2001). And on top of that, the Fifth Circuit has firmly repudiated the contention that—based on the scope of the evidence prescribed by the mitigation special issue—Texas's capital sentencing scheme unconstitutionally precludes from consideration categories of evidence that a sentencer may consider to be relevant mitigating evidence. *See Sprouse*, 748 F.3d at 622; *Blue v. Thaler*, 665 F.3d. 647, 663–68 (5th Cir. 2011).

Of further noteworthiness is that Petitioner's conviction and sentence became final under *Teague* no later than February 17, 2021. This reflects the date in which Petitioner's time window for filing a certiorari petition with the U.S. Supreme Court had expired, which was the ninety-first day following the affirmation of his conviction and sentence by the Texas Court of Criminal Appeals on November 18, 2020. *See Caspari*, 510 U.S. at 390; Rule 13.1, Rules of the Supreme

27

Court of the United States (providing that the deadline for filing a certiorari petition is ordinarily 90 days from the date of the judgment for which certiorari review is sought).

Since controlling federal law affirms the constitutional validity of the future dangerousness and mitigation special issues, and no clearly established Supreme Court precedent points in the opposite direction as of the date of Petitioner's final conviction and sentence, *Teague* bars this Court from accepting Petitioner's challenges to the Texas capital sentencing special issues. *See Scheanette v. Quarterman*, 482 F.3d 815, 827 (5th Cir. 2007) (citing *Teague v. Lane*, 489 U.S. 288 (1989)). This is so regardless of whether they are packaged within an IAC claim or brought as an independent standalone claim against the entire capital sentencing scheme. And even assuming *arguendo* that these *de novo* findings are not fatal to Petitioner's challenges, Petitioner *himself* even concedes that binding circuit precedent forecloses them on the merits.[39]

The Court therefore finds that Petitioner's constitutional attacks on the Texas capital sentencing special issues are baseless.

ii.   <u>Twelve/Ten Rule</u>

Petitioner next argues that the twelve/ten rule in Texas's capital sentencing scheme is unconstitutional. *See* Tex. Code Crim. Proc. art. 37.071.[40] Specifically, Petitioner contends that the rule is invalid for inclusion of an instruction to reach a unanimous or ten-person vote on special issues and for want of an instruction on the effect of a hung jury. Petitioner's state habeas petition raised an IAC claim for appellate counsel's failure to challenge the twelve/ten rule on appeal.[41] Petitioner did not otherwise raise an independent constitutional claim along these lines. Petitioner maintains that it was objectively unreasonable and prejudicial for appellate counsel to not have

---

[39] Amend. Pet. at 114 n. 38 (citing *Beazley v. Johnson*, 242 F.3d 248 (5th Cir. 2001)).
[40] Amend. Pet. at 115.
[41] State Pet. at 360-68.

raised this issue on appeal, and that the state habeas court's contrary finding was unreasonable or contrary to clearly established federal law. *See* 28 U.S.C. § 2254(d)(1). But even under another *de novo* inquiry, the Court finds no merit to this, either.

To begin with, the Fifth Circuit has already rejected this exact constitutional attack on the twelve/ten rule time after time again. *See Sprouse*, 748 F.3d at 623; *Blue*, 665 F.3d at 669–70; *Druery v. Thaler*, 647 F.3d 535, 542-45 (5th Cir. 2011); *see also Johnson v. Lumpkin*, 593 F. Supp. 3d 468, 504-08 (N.D. Tex. 2022), *aff'd*, 74 F.4th 334 (5th Cir. 2023). *A fortiori*, the Supreme Court has also disposed of carbon-copy arguments to those put forth by Petitioner, albeit in the federal capital sentencing regime. *See Jones v. United States*, 527 U.S. 373, 381-84 (1999) (holding that the Constitution does not require the provision of a capital sentencing jury instruction on the effect of a "breakdown in the deliberative process"). In a clear rebuke of Petitioner's precise contention here, the Supreme Court posited that the omission of such an instruction does *not* mislead capital sentencing jurors regarding their role in the sentencing process. *See id.* Rather, the *inclusion* of such an instruction would instead serve to undermine the State of Texas's "strong governmental interest" in having Petitioner's sentencing jury "express the conscience of the community on the ultimate question of life or death." *Id.* (cleaned up). Petitioner's reliance on *Mills v. Maryland*, 486 U.S. 367 (1988), *McKoy v. N.C.*, 494 U.S. 433 (1990), and *Caldwell v. Mississippi*, 472 U.S. 320 (1985) is inapposite and of no moment in this context, either. For binding circuit precedent has categorically disposed of all attempts at shoehorning these holdings into meritorious Eighth and Fourteenth Amendment challenges to the Texas twelve/ten rule. *See Johnson*, 593 F. Supp. 3d at 505-06, *aff'd*, 74 F.4th 334 (collecting and discussing cases).

Upon review, the Court finds that federal law clearly establishes the constitutionality of the Texas twelve/ten rule with respect to its instruction on reaching a unanimous or ten-person vote

on special issues and its lack of an instruction on the result of a hung jury. Bereft of any clearly established supporting authorities, Petitioner's argument to the contrary would have the Court "adopt a new rule of constitutional criminal procedure" in order for the petitioned habeas corpus writ to issue. *Blue*, 665 F.3d at 670. Under the non-retroactivity principle of *Teague*, then, this challenge to Texas's capital sentencing scheme is similarly barred. *See id.* (citing *Teague v. Lane*, 489 U.S. 288 (1989)). These *de novo* findings are also dispositive of Petitioner's argument that the state habeas court unreasonably denied his IAC claim against appellate counsel, which is based on the same underlying challenge.

As such, the Court finds Petitioner's constitutional attack on the Texas twelve/ten rule to be meritless.

### iii.   Application of the Death Penalty

Petitioner puts forth yet another argument against the validity of Texas's capital sentencing scheme—this time that Texas administers the scheme with arbitrariness and caprice.[42] Specifically, Petitioner contends that the death penalty is issued arbitrarily along geographic and racial lines within the State in violation of the constitutional requirement that capital sentencing schemes be "'controlled by clear and objective standards so as to produce non-discriminatory application.'"[43] Petitioner's state habeas petition raised an IAC claim based on appellate counsel's failure to bring an arbitrary application challenge on appeal.[44] Petitioner did not otherwise raise this as a standalone constitutional claim. Once again, Petitioner maintains it was objectively unreasonable and prejudicial for appellate counsel to not have raised this issue on appeal, while the state habeas court's opposite finding was unreasonable or contrary to clearly established federal

---

[42] Amend. Pet. at 115.
[43] *Id.* (quoting *Gregg v. Georgia*, 428 U.S. 153, 198 (1976)).
[44] State Pet. at 398-411.

30

law. *See* 28 U.S.C. § 2254(d)(1). But under *de novo* review once again, the Court finds this to be without arguable merit.

At the outset, the Fifth Circuit and Supreme Court do not recognize a constitutional prohibition against the imposition of a capital sentence merely because the capital punishment regime more broadly is enforced against capital murders in a geographically disparate manner. *Allen v. Stephens*, 805 F.3d 617, 628-631 (5th Cir. 2015), *abrogated on other grounds by Ayestas v. Davis*, 138 S. Ct. 1080, 1093 (2018) ("[N]o Supreme Court case has held that the Constitution prohibits geographically disparate application of the death penalty due to varying resources across jurisdictions."). Conversely, the Supreme Court has affirmatively acknowledged that capital punishment is constitutionally permissible notwithstanding its lack of unform application brought about by varying prosecutorial discretionary considerations and law enforcement resources and capabilities. *Id.* (citing *McCleskey v. Kemp*, 481 U.S. 279, 307 n.28 (1987)).

With respect to racially discriminatory application of capital punishment, the Fifth Circuit and Supreme Court require Petitioner to show "'that the decisionmakers in *his* case acted with discriminatory purpose.'" *Kelly v. Lynaugh*, 862 F.2d 1126, 1135 (5th Cir. 1988) (quoting *McCleskey*, 481 U.S. at 291-98). In this regard, "alleged racial discrimination in the decision to prosecute a criminal defendant for capital murder and in the decision to impose a sentence of death are essentially complaints of selective prosecution." *Johnson*, 593 F. Supp. 3d at 509, *aff'd*, 74 F.4th 334 (citing *Broadnax v. Davis*, No. 3:15-CV-1758-N, 2019 WL 3302840, at *14 (N.D. Tex. July 23, 2019) (Godbey, J.), *aff'd sub nom. Broadnax v. Lumpkin*, 987 F.3d 400 (5th Cir. 2021)). A selective prosecution inquiry "necessarily begin[s] with a presumption of good faith and constitutional compliance" on the part of the decisionmakers. *Broadnax*, 2019 WL 3302840, at *14, *aff'd sub nom.*, 987 F.3d 400 (citing *United States v. Armstrong*, 517 U.S. 456, 463-64

31

(2006)). The general rule of thumb is that so long as there was "probable cause to believe that [Petitioner] committed an offense defined by statute, the decision whether or not to prosecute, and what charge to file" presumptively rested within the decisionmaker's discretion. *Bordenkircher v. Hayes*, 434 U.S. 357, 364 (1978). Thus, if Petitioner's crime fits within Texas's definition of capital murder and that definition is constitutionally sound, "the conscious exercise of some selectivity in enforcement is not in itself a federal constitutional violation" unless the selection was "deliberately based upon . . . race." *Oyler v. Boles*, 368 U.S. 448, 456 (1962).

Here, the killing spree committed by Petitioner constitutes a murder crime for which the Constitution of the United States and the laws of the State of Texas sanction capital punishment. *See McCleskey*, 481 U.S. at 297. There can be no doubt, therefore, that the decision to pursue and impose the death penalty against Petitioner fell squarely within the decisionmakers' legitimate discretion here. *See Bordenkircher*, 434 U.S. at 364; *Oyler*, 368 U.S. at 456. Petitioner then fails to rebut this "presumption of good faith and constitutional compliance" on the part of the prosecutorial and sentencing authorities involved in his case. *Broadnax*, 2019 WL 3302840, at *14, *aff'd sub nom.*, 987 F.3d 400. Petitioner proffers no evidence and alleges no specific facts to suggest that any racially discriminatory motive or purpose played a role in the decisions to pursue a capital murder prosecution and impose a capital sentence against him for a murder spree that took the lives of a pregnant mother and her baby, a mother, and a ten-year-old child. *See Broadnax v. Lumpkin*, 987 F.3d 400, 414 (5th Cir. 2021); *Johnson*, 593 F. Supp. 3d at 509, *aff'd*, 74 F.4th 334. Instead, Petitioner's argument on this front is altogether conclusory. Consequently, Petitioner fails to establish that the decisionmakers in his case arbitrarily applied Texas's capital sentencing scheme on the basis of race. *See Johnson*, 593 F. Supp. 3d at 509-511, *aff'd*, 74 F.4th 334; *White v. Thaler*, 522 F. App'x 226, 235 (5th Cir. 2013); *Kelly*, 862 F.2d at 1135.

32

Absent any on-point Supreme Court precedent to support this particular challenge to Texas's capital sentencing scheme, it is precluded under *Teague* for asking the Court "adopt a new rule of constitutional criminal procedure." *Blue*, 665 F.3d at 670. These *de novo* findings are also dispositive of Petitioner's argument that the state habeas court unreasonably denied his IAC claim against appellate counsel, which is based on the same underlying challenge.

As a result, the Court finds no arguable merit to Petitioner's constitutional attack on the application of Texas's capital sentencing scheme.

iv.      Post-Conviction Proceedings

Petitioner advances one last argument under the umbrella of this substantive constitutional claim—namely, that Texas's state habeas proceedings unfairly deprived him of the opportunity to be heard in conformance with due process of law.[45] Specifically, Petitioner contends that the state habeas court failed to protect his due process rights by refusing to hold a live evidentiary hearing. Reviewing *de novo* yet again, the Court finds the allegation of a constitutionally defective post-conviction relief process to be incognizable.

As the Fifth Circuit has recurringly affirmed, "[i]t is axiomatic that infirmities in state habeas proceedings under state law are not a basis for federal habeas relief." *Wiley v. Epps*, 625 F.3d 199, 207 (5th Cir. 2010) (citing *Moore v. Dretke*, 369 F.3d 844, 846 (5th Cir. 2004) (per curiam)); *Hallmark v. Johnson*, 118 F.3d 1073, 1080 (5th Cir. 1997). The reasoning behind this well-entrenched principle is that an attack on the validity of a state habeas proceeding "is an attack on a proceeding collateral to the detention and not the detention itself," and thus has no bearing on the validity of the underlying state conviction and sentence. *Rudd v. Johnson*, 256 F.3d 317, 319-320 (5th Cir. 2001). The other main reason is that "a state has no constitutional duty to provide

---

[45] Amend. Pet. at 116-17.

post-conviction remedies" in the first place. *Millard v. Lynaugh,* 810 F.2d 1403, 1410 (5th Cir. 1987). Conversely then, federal habeas courts "look only to the trial and direct appeal" proceedings at the state level for potential constitutional infirmities. *Duff–Smith v. Collins,* 973 F.2d 1175, 1182 (5th Cir. 1992).

Under the same controlling authorities, there can be no doubt that a constitutional due process attack on a state's post-conviction relief process falls squarely within this categorical bar to federal habeas corpus relief. *See Kinsel v. Cain*, 647 F.3d 265, 273, n. 23 (5th Cir. 2011) (applying the "no state habeas infirmities" rule to preclude federal habeas review of a due process claim against a state appellate court's post-conviction proceedings); *Hallmark*, 118 F.3d at 1080 ("Insofar as [petitioner] raises a due process challenge to the state habeas proceedings, his claim fails because infirmities in state habeas corpus proceedings do not constitute grounds for relief in federal court." (citing *Duff–Smith*, 973 F.2d at 1182)). Even more directly on point to the argument advanced here, Fifth Circuit habeas panels have uniformly applied this categorical rule to dispose of procedural due process claims predicated upon a state court's failure to hold a live evidentiary hearing on a post-conviction application. *See, e.g.*, *Mathis v. Dretke*, 124 F. App'x 865, 871-72 (5th Cir. 2005); *Tercero v. Stephens*, 738 F.3d 141, 147-49 (5th Cir. 2013); *Rockwell v. Davis*, 853 F.3d 758, 761 n. 5 (5th Cir. 2017).

Here, Petitioner *himself* concedes as much.[46] But even assuming otherwise, this Court is nonetheless bound by circuit precedent to defer to the state habeas court's findings under the no state habeas infirmities rule. *Ibid*. Moreover, due process of law "does not require a full trial on the merits" in the habeas context anyway, but merely that Petitioner has an "opportunity to develop his claim." *Rivera v. Quarterman,* 505 F.3d 349, 358 (5th Cir. 2007). With this understanding,

---

[46] Amend Pet. at 116 n. 39, 117.

Petitioner's allegation that the state habeas court trampled over his right to be heard collapses under its own weight. Petitioner was able to submit thousands of pages of thorough briefing and supporting exhibits throughout the state habeas process that the state habeas court comprehensively reviewed and rejected. This was more than an "ample opportunity to 'develop his claims'" in the state habeas proceedings. *Rockwell v. Davis*, 853 F.3d at 761 n. 5 (quoting *Tercero*, 738 F.3d at 148). In multiple facets then, Petitioner's argument seeks a "new rule of constitutional criminal procedure" that is *Teague*-barred. *Blue*, 665 F.3d at 670.

For the foregoing reasons, the Court finds that Petitioner's constitutional attack on the post-conviction relief process provided by Texas fails to raise a cognizable claim for relief.

Accordingly, the Court holds that this claim does not entitle Petitioner to habeas relief from his conviction and sentence and should therefore be **DENIED**.

### 5. Constitutionality of Death Penalty (Claim Nine)

Petitioner asserts that the death penalty *itself* is "unconstitutional under the Eighth and Fourteenth Amendments," and thus the sentence should be entirely vacated on that basis.[47] The Court is wholly unmoved by Petitioner's ninth and final claim.

The Eighth Amendment provides that "cruel and unusual punishments [shall not be] inflicted." U.S. CONST. AMEND. VIII. This was made applicable to the States through the Fourteenth Amendment. *See Robinson v. California*, 370 U.S. 660, 666 (1962). It is deeply enshrined in our legal tradition that "capital punishment is constitutional" for the crime of murder. *Baze v. Rees*, 553 U.S. 35, 47 (2008) (citing *Gregg v. Georgia*, 428 U.S. 153, 176-77 (1976)). For since "the time of the adoption of the Constitution and the Bill of Rights" and long beyond, execution has been a widely accepted—and more often than not, the preferred—administration of

---

[47] Amend. Pet. at 117-18.

justice for those convicted of slaughtering innocent human life. *See Glossip v. Gross*, 576 U.S. 863, 867-69 (2015); *Gregg*, 428 U.S. at 168-172, 176-78.

To that end, the Constitution "reserve[s] for the people and their representatives" this determination regarding the proper course of justice for murderers. *Bucklew v. Precythe*, 139 S. Ct. 1112, 1122-23 (2019). Following thousands of years of Western legal tradition, the people of the State of Texas have duly determined that under the law, Petitioner's decision to deliberately deprive other human beings of innocent life within a single killing spree should render the deprivation of his own. *See* TEX. PENAL CODE §§ 19.03(a)(7), 19.02(b)(1). That is their prerogative under the Constitution. *See Bucklew*, 139 S. Ct. at 1122-23; *Glossip*, 576 U.S. at 869; *Gregg*, 428 U.S. 153. Very simply then, even when reviewing *de novo*, Petitioner's last-ditch attempt at preventing the justice that is due falls entirely flat.

Accordingly, the Court holds that this claim does not entitle Petitioner to habeas relief from his conviction and sentence and should therefore be **DENIED**.

### 6.  Ineffective Assistance of Trial Counsel (Claims Two, Three, & Five)

The second, third, and fifth claims in the Amended Petition allege that trial counsel rendered ineffective assistance in violation of Petitioner's Sixth and Fourteenth Amendment rights.[48] In particular, Petitioner contends that trial counsel: (1) conceded the future dangerousness special issue; (2) failed to investigate Petitioner's post-traumatic stress disorder ("PTSD"), mental health, history of childhood sexual abuse, and background; (3) failed to present all available mitigating evidence; (4) failed to rebut the prosecution's evidence of *mens rea* with evidence that Petitioner suffered from PTSD and a psychotic break at the time of his capital offense; (5) failed to challenge for cause or exercise a peremptory challenge against a venire member and eventual

---

[48] Amend. Pet. at 40-107.

36

juror who could not serve impartially; (6) failed to offer and get the full and complete videotape recording of Defense Exhibit 84A admitted into the record; (7) made racially charged comments about Petitioner during trial; and (8) rendered cumulative ineffective assistance.

The Court reviews all of Petitioner's ineffective assistance allegations *de novo* in light of the evidence presented during Petitioner's capital murder trial and sentencing, state direct appeal, and state habeas corpus proceedings, as well as all novel evidence presented for the first time in federal habeas proceedings. For the reasons discussed at length below, none of Petitioner's complaints about the performance of trial counsel satisfy the constitutional standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984) under a *de novo* standard of review.

i.   Legal Standard

To prevail on an ineffective assistance of counsel claim, a petitioner bears the burden of demonstrating that: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the petitioner's defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

(1) To satisfy the deficiency prong, a petitioner must establish that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). Counsel's performance is objectively unreasonable where "no competent attorney" would have taken the action that counsel did. *Premo v. Moore*, 562 U.S. 115, 124 (2011). In order to meet his burden, a petitioner must overcome the "strong presumption" of adequate assistance, i.e., that counsel's conduct fell "within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689-90. (2) To satisfy the prejudice prong, a petitioner must establish a "reasonable probability" that, but for the objectively unreasonable conduct of counsel, "'the result of the proceeding would have been different.'" *Wiggins*, 539 U.S. at 534 (quoting *Strickland*, 466 U.S. at 694). A reasonable probability is one that is "'sufficient to undermine confidence in the

outcome'" of the proceeding at issue. *Id.* To reemphasize, *Strickland* demands that courts supply a substantial degree of deference to the reasoned professional judgments and decisions of trial counsel. *See id.* at 523; *Strickland*, 466 U.S. at 690.

      ii.    <u>Concession of Future Dangerousness Special Issue</u>

Insofar as Petitioner argues that his trial counsel conceded future dangerousness by presenting evidence that Petitioner was genetically predisposed toward violence, Petitioner is in error. The state habeas court found as a matter of fact, and the Court agrees after an independent review of the entire record of state proceedings, that Petitioner's trial counsel did not concede the future dangerousness special issue in the punishment phase of the capital murder trial.

Petitioner's trial counsel did present double-edged evidence showing that Petitioner's genetic makeup, combined with Petitioner's history of an abusive and traumatic childhood, rendered Petitioner more likely than other people to react violently in response to a stressful situation. The state trial court excluded for lack of scientific foundation the vast majority of the defense's proposed expert testimony on other genetic aspects of the defense's case in mitigation. Nevertheless, trial counsel was able to present some evidence demonstrating that these genetic factors in combination with childhood trauma reduced Petitioner's moral blameworthiness for his horrific capital offense.

Generally, it is objectively reasonable for trial counsel to make an *informed* decision on whether to proceed with a particular strategy that has the potential for a double-edged outcome. *See Mejia v. Davis*, 906 F.3d 307, 316 (5th Cir. 2018) (informed decision to forego a lesser-included offense instruction when defendant was entitled to same); *Chanthakoummane v. Stephens*, 816 F.3d 62, 70 (5th Cir. 2016) (informed decision to not present testimony from defendant's family out of concern for opening the door to evidence of gang affiliation and violent

38

history); *St. Aubin v. Quarterman*, 470 F.3d 1096, 1103 (5th Cir. 2006) (informed decision not to present evidence that could be construed by jury as both mitigating and aggravating); *Rector v. Johnson*, 120 F.3d 551, 564 (5th Cir. 1997) (informed decision not to present evidence showing the defendant suffered from child abuse, family instability, poor education, low intelligence, gunshot injuries, and family history of severe and chronic mentally illness).

It cannot be overemphasized that Petitioner' capital offense included fatally shooting a ten-year-old boy repeatedly *after* already fatally shooting the boy's eight-month pregnant sister and their mother. There was no evidence to suggest that Petitioner's final victim, E.M., had engaged in any aggressive behavior toward Petitioner at the time Petitioner fired multiple fatal shots directly into the ten-year-old body, including one to the head. Nor can the Court ignore the fact that Chanice Reed's unborn male child of eight months had been declared viable at the time of his death by the medical examiner testifying at Petitioner's trial. Petitioner was thus responsible for taking the lives of four innocent human beings on July 1, 2013.

The Court also finds that trial counsel presented a substantial case in mitigation. In addition to the experts testifying to Petitioner's genetic predisposition for violence, the defense also presented numerous fact and expert witnesses testifying to the unstable, traumatic nature of Petitioner's childhood upbringing. Trial counsel was restricted from presenting further mitigating evidence via Petitioner's own express directives. Specifically, Petitioner instructed trial counsel not to proffer any evidence indicating either that Petitioner had been the victim of multiple instances of childhood sexual abuse, or that Petitioner's daughter showed signs of emotional or mental problems (including acts of violence at school).

The Court finds that under the arduous circumstances surrounding Petitioner's case, trial counsel's mitigation strategy on future dangerousness was objectively well-reasoned professional

advocacy. Based on that finding, this IAC claim satisfies neither *Strickland* prong under a *de novo* examination and thus does not warrant federal habeas relief.

### iii.    Failure to Investigate Petitioner's PTSD & Childhood Abuse

The Court finds that trial counsel thoroughly investigated Petitioner's upbringing and became well aware of his childhood history of instability and traumatic abuse, including that he had been sexually abused. Trial counsel also became well aware of Petitioner's family history of emotional issues and mental illness, including his mother's extreme narcissism and daughter's emotional outburst at school. The expansive mitigation case actually presented at trial belies Petitioner's claim that trial counsel failed to adequately investigate his background.

Trial counsel cannot reasonably be faulted for failing to present evidence from Petitioner's background that would have been cumulative or duplicative of the already-extensive mitigation case presented during the punishment phase of the capital murder trial. *Howard v. Davis*, 959 F.3d 168, 173 (5th Cir. 2020) (citing *Richards v. Quarterman*, 566 F.3d 553, 568 (5th Cir. 2009)); *Norman v. Stephens*, 817 F.3d 226, 233 (5th Cir. 2016) (holding that a defendant is not prejudiced by the failure of trial counsel to present cumulative evidence).

Under *de novo* review, this conclusory IAC claim fails to satisfy either prong of the *Strickland* test necessary to warrant federal habeas relief.

### iv.    Failure to Present All Available Mitigating Evidence

For similar reasons, neither prong of *Strickland* is satisfied by the conclusory allegation that trial counsel failed to present all available mitigating evidence.

The Court finds that trial counsel rendered objectively reasonable assistance to Petitioner in presenting a comprehensive mitigation case. While it did not include evidence of Petitioner's childhood sexual abuse, trial counsel's decision in that respect was the product of Petitioner's own

directives. Trial counsel cannot reasonably be faulted for following the express instructions of a client when it comes to the presentation of mitigating evidence. *Wood v. Quarterman*, 491 F.3d 196, 203 (5th Cir. 2007) ("Neither the Supreme Court nor this court has ever held that a lawyer provides ineffective assistance by complying with the client's clear and unambiguous instructions to not present evidence.").

Petitioner fallaciously asserts that trial counsel was required to exhaustively interview and present testimony from even more of Petitioner's acquaintances and family members. But trial counsel was not obligated to engage in an endless fishing expedition for every conceivable source of information that might potentially benefit the defense. *See Thomas v. Lumpkin*, 995 F.3d 432, 456 (5th Cir. 2021) (holding that duty to investigate does not force defense lawyers to "scour the globe on the off chance something will turn up." (quoting *Rompilla*, 545 U.S. at 383)). Rather, trial counsel in capital cases have a duty to make *reasonable* investigations or decisions that make certain investigations unnecessary. *See Andrus v. Texas*, 140 S. Ct. 1875, 1881 (2020); *Bobby*, 558 U.S. at 11-12. "[A] particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Andrus*, 140 S. Ct. at 1881 (cleaned up). Here, the Court does not second guess the reasonable investigatory decisions taken pursuant to trial counsel's thorough mitigation case.

The Court also finds no reasonable probability that, but for the failure of trial counsel to present all of the "new" mitigating evidence identified in the Amended Petition, the outcome of Petitioner's capital sentencing would have been any different. The horrific details of Petitioner's merciless killing spree, on their own, established beyond any doubt that Petitioner posed a real and substantial threat of future violence both inside and outside of prison. Petitioner's brutal assault of another inmate while awaiting his capital murder trial in jail only reaffirms that conclusion. The

41

subsequent recantation of Petitioner's inmate victim proves little to nothing. *See Summers v. Dretke*, 431 F.3d 861, 872 (5th Cir. 2005) (recanting affidavits are viewed with extreme suspicion); *Spence v. Johnson*, 80 F.3d 989, 1003 (5th Cir. 1996) (recanting affidavits and testimony are disfavored and must be compared to the trial record to determine if they are worthy of belief).

Furthermore, Petitioner's "new" evidence pales in comparison to the type and scope of new evidence sufficient to satisfy the prejudice prong of *Strickland*. In the context of punishment phase mitigation in capital cases, the Supreme Court has held that it is unreasonable to not investigate further when information is made available to counsel that suggests additional mitigating evidence of circumstances such as mental illness or childhood abuse may be attainable. *See Porter*, 558 U.S. at 39-40; *Wiggins*, 539, U.S. at 524-26; *Williams*, 529 U.S. at 395-96.

Here, Petitioner's *Wiggins* claim fails to satisfy the prejudice prong of *Strickland* for two reasons. First, much of the "new" evidence identified in the Amended Petition was *not* available to trial counsel during the punishment phase proceedings because Petitioner *himself* directed trial counsel *not* to present these types of mitigating evidence. *See Wood*, 491 F.3d at 203. Second, much of the "new" evidence identified in the Amended Petition was largely cumulative or duplicative of the already-extensive mitigation case that trial counsel presented during the punishment phase proceedings. *See Norman*, 817 F.3d at 233. Much more than that, Petitioner's capital offense involved the brutal and senseless slaughtering of four innocent human beings, including a ten-year-old child, a pregnant woman and her mother, and a viable baby. Petitioner fired direct headshots into three of his victims as well as shooting multiple rounds into each of them. These were not just murders, but brutal executions. The Court finds no "new" evidence in the Amended Petition that would serve mitigate this any further than what trial counsel presented.

Petitioner's claim satisfies neither prong of *Strickland* when examined under *do novo*

42

review and does not warrant federal habeas relief.

v.      Failure to Rebut *Mens Rea* Evidence at Guilt-Innocence Phase

To the extent that Petitioner alleges trial counsel should have attempted to rebut the prosecution's *mens rea* evidence of his intent to murder the four victims on July 1, 2013, Petitioner misconstrues applicable state law. The State of Texas does not recognize a diminished capacity defense in murder cases unless the evidence of diminished capacity rises to the level of legal insanity. Presently, this is limited to evidence establishing that a defendant suffered from a mental disease or defect so severe as to rebut or disprove the culpable mental state for the offense. *See Ruffin v. State*, 270 S.W.3d 586, 593 (Tex. Crim. App. 2008) ("Insanity is the only 'diminished responsibility' or 'diminished capacity' defense to criminal responsibility in Texas."). Section 8.01(a) of the Texas Penal Code provides that it is "an affirmative defense to prosecution that, at the time of the conduct charged, the actor, as a result of severe mental disease or defect, did not know that his conduct was wrong." *Battaglia v. State*, 537 S.W.3d 57, 61 n.3 (Tex. Crim. App. 2017).

Petitioner does not identify with specificity any opinion or conclusion from the numerous mental health experts who evaluated him that indicates the availability and willingness to testify at trial that Petitioner was legally insane during the commission of the murders. It is undisputed that immediately following his arrest, Petitioner was able to describe the events leading up to his capital offense in excruciating detail to law enforcement. So too, it is also undisputed that Petitioner telephoned his former girlfriend immediately after the offense to report that he had killed three people. These facts belie Petitioner's contention that he was unconscious at the time he fatally gunned down four innocent people. On top of that, Dr. McGarrahan's pretrial report to trial counsel indicated that Petitioner had no history of psychotic episodes. Based on this record, it is

overwhelmingly clear that trial counsel acted objectively reasonable in deciding to refrain from presenting a defense based on Petitioner's lack of *mens rea* to commit capital murder.

*A fortiori*, any attempt on the part of trial counsel to rebut Petitioner's *mens rea* in the guilt-innocence phase of the capital murder trial would have been futile. *See Coble v. Quarterman*, 496 F.3d 430, 437-38 (5th Cir. 2007) (holding that "counsel was not ineffective for failing to present a diminished capacity defense because diminished capacity is not cognizable in Texas"). Under the current Texas Penal Code, any such evidence of diminished responsibility falling short of legal insanity is now applicable only in the punishment phase of trial, not the guilt-innocence phase. *See Jackson v. State*, 160 S.W.3d 568, 573 (Tex. Crim. App. 2005) (citing *Wagner v. State*, 687 S.W.2d 303 (Tex. Crim. App. 1984)). Thus, the decision *not* to present the mental health evidence and defense theory that Petitioner claims trial counsel should have presented in the guilt-innocence phase of trial was objectively reasonable.

Based on the foregoing *de novo* review, this IAC claim fails to satisfy either prong of *Strickland* and is therefore unwarranting of federal habeas relief.

vi.   Failure to Challenge for Cause or Peremptorily Challenge Venire Member

Petitioner alleges that trial counsel should have either challenged for cause or used a peremptory challenge against a venire member and eventual juror who lacked the capacity to sit impartially on Petitioner's case.[49] This IAC claim fares no better.

The individual at issue was a non-native English speaker and immigrant who expressed his support for the death penalty in his jury questionnaire "because if you kill somebody, he or she must be killed, too."[50] After the prosecution explained the presumption of innocence and the

---

[49] Amend. Pet. at 89.
[50] 17 R.R. 19.

operation of the Texas capital sentencing special issues, the venire member testified that he could apply the presumption of innocence.[51] The venire member then responded that: he understood the burden of proof was on the prosecution to prove future dangerousness beyond a reasonable doubt; he would not automatically vote to impose the death penalty on a defendant found guilty of murdering two people; and he understood the meaning of the terms included in the mitigation special issue.[52] When questioned by trial counsel, the venire member repeatedly testified that he would answer the special issues based upon the evidence.[53]

The selection of a jury is more of an art than a science. *Romero v. Lynaugh*, 884 F.2d 871, 878 (5th Cir. 1989) (recognizing that "the selection of a jury is, inevitably, a call upon experience and intuition" where trial counsel "must draw upon his own insight and empathic abilities"). A trial counsel's actions during voir dire are considered to be a matter of trial strategy; such decisions cannot be the basis for an IAC claim unless trial counsel's tactics are shown to be so ill-chosen that they permeate the entire trial with obvious unfairness. *Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir. 1995). As for the bias of a prospective juror, such does not constitutionally disqualify him or her from sitting on a case "if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." *Irvin v. Dowd*, 366 U.S. 717, 722 (1961).

Here, trial counsel explained in affidavits furnished to the state habeas trial court that the decision not to exercise a peremptory challenge against this venire member was borne out of a concern for running out of peremptory strikes prematurely, which might have required trial counsel to accept an even less desirable venire member as a juror later on in the proceedings. Having independently reviewed the entirety of the venire member's voir dire examination, as well as the

---

[51] 17 R.R. 23–26.
[52] 17 R.R. 26–37, 42-46.
[53] 17 R.R. 55–65.

venire member's answers to the jury questionnaire, the Court finds it was objectively reasonable for trial counsel to pass on a for-cause or peremptory challenge against him. The juror questionnaire responses of a venire member unfamiliar with the Texas capital sentencing scheme do not establish an irrebuttable presumption of disqualifying bias. Rather, the venire member's sworn testimony during individual voir dire offers a far more illuminating insight into the views and mindset of a potential juror. Rather than am insistence on imposing the death penalty in all cases of multiple murderers, this venire member's voir dire responses revealed his ability to set aside personal views, following applicable law, and answer the capital sentencing special issues in accordance with the evidence presented. This is all that the Constitution requires from a potential juror. *See Irvin v. Dowd*, 366 U.S. at 722. Thus, the voir dire testimony of this venire member clearly established that he was not subject to a for-cause challenge. It was likewise objectively reasonable for Petitioner's trial counsel to believe that exercising a peremptory strike against this venire member might have led to the seating of an even less desirable juror later.

Petitioner has not alleged any specific facts showing a reasonable probability that, but for the failure of trial counsel to successfully challenge the venire member at issue, the outcome of either phase of Petitioner's capital murder trial would have been different. Therefore, the Court finds the decision of trial counsel not to challenge the venire member to have been a perfectly reasonable voir dire strategy that did not infect the trial with unfairness. *See Teague v. Scott*, 60 F.3d at 1172. This claim fails to satisfy either prong of *Strickland* under *de novo* review and does not warrant federal habeas relief.

      vii.    <u>Failure to Have the Entirety of Defense Exhibit 84 Admitted into the Record</u>

The Court has independently reviewed every videotape recording submitted by the parties on federal habeas review, including the full version of Exhibit 84A at issue in this IAC claim. The

exhibit in question contains rank hearsay in that it records a post-arrest conversation between Petitioner and a media representative. For the reasons set forth in Section III(A)(1)-(6) of this opinion, the exclusion of Exhibit 84A during Petitioner's trial did not render his trial fundamentally unfair. Moreover, after independently reviewing Exhibit 84A in its entirety, the Court finds there to be absolutely no possibility, much less a reasonable probability that but for the failure of trial counsel to offer or convince the trial court to admit the entirety of Exhibit 84A into the record for the jury to review, the jury would not have sentenced Petitioner to death.

The question confronting the jury during the punishment phase of Petitioner's capital murder trial was not whether Petitioner's somber demeanor on July 2, 2013 was sufficiently redeeming to warrant a life sentence. Rather, the court was confronted with a defendant who refused to discuss the details of his capital offense during his time on the witness stand. The sentencing jury had ample opportunity during Petitioner's punishment phase testimony to examine his demeanor first-hand and determine whether he was sincerely contrite and genuinely remorseful for his merciless killing spree of four innocent lives. Petitioner's teary-eyed statements made during the television interview in Exhibit 84A were not under oath or subject to any diligent fact-checking, nevermind a full cross-examination. In all reasonable likelihood, Petitioner's sentencing jury would have seen these teary-eyed statements for what they were—a collection of self-serving drivel voiced by a convicted murderer who brutally butchered four innocent, vulnerable human beings with multiple point-blank gunshots, including two children.

The reason behind Petitioner's murderous rampage was obvious from his own descriptions of the events leading up to it: Petitioner was outraged that Chanice Reed had asked him to consider giving up his parental rights to their unborn child of eight months. Petitioner could not contain his rage and, as he had previously done on several occasions to both Reed and prior paramour Brooks,

47

Petitioner lashed out at his pregnant girlfriend with extreme violence. The Court concludes there is no reasonable probability that, but for the failure of trial counsel to get the full version of Exhibit 84A admitted, the jury would not have sentenced Petitioner to death after watching his entire teary-eyed, self-promotional media appearance with the press. This claim fails to satisfy either prong of *Strickland* under a *de novo* standard of review and does not warrant federal habeas relief.

        viii.    <u>Racially Charged Commentary</u>

Petitioner's fifth claim contends that trial counsel rendered ineffective assistance by making racially derisive comments before the sentencing jury. Petitioner specifically complains that trial counsel: stated "young black kids with guns is probably not a good situation" in a question posed to a witness on cross-examination; failed to object to the prosecution's remark that Petitioner "[n]ever became a gang member, although he could have" in closing argument; and referred to Petitioner as "the gangster" in closing argument. [54] Though these comments may appear inappropriate in isolation, they do not amount to constitutionally ineffective assistance when assessed in context.

First, a cursory glance at the exchange on cross-examination makes clear that the focus of the parties' questioning regarding Petitioner's firearm possession was Petitioner's age—not his race.[55] Neither trial counsel's questions nor the witness's answers expressly linked or attempted to link Petitioner's race with a propensity for future violence. For constitutional purposes, it was not suggested to the sentencing jury "that the color of [Petitioner's] skin made him more deserving of execution." *Buck*, 580 U.S. at 119. On the other hand, it is very well settled that a defendant's youth can be a mitigating factor in capital sentencing. *See Johnson*, 509 U.S. at 368. This was the

---

[54] Amend. Pet. at 103–07.
[55] 45 R.R. 213–15.

core aim of trial counsel's line of questioning containing the complained-of remark. Petitioner's disagreement with this mitigation strategy is not demonstrative of trial counsel's deficiency. *See Yarborough v. Gentry*, 540 U.S. 1, 9 (2003).

Second, the prosecution's unobjected-to remarks at closing were a mere acknowledgment of trial counsel's mitigation case. The prosecution stated that the jury could "fairly find mitigating" that Petitioner was "born into tough circumstances" and did not become "a gang member, although he could have."[56] The record clearly shows that these were mitigating circumstances of which trial counsel purposely had witnesses testify to.[57] This is a not a legitimate basis for Petitioner to complain of a failed objection and thereby allege trial counsel's deficiency. *See Nixon v. Epps*, 405 F.3d 318, 328 (5th Cir. 2005) (finding no deficiency under *Strickland* for a fruitless objection).

Lastly, with respect to trial counsel's reference to Petitioner as "the gangster" on the heels of the prosecution's closing argument, the Court can only infer that trial counsel made this reference with a sarcastic tone or with intent to illuminate the defense's key mitigation fact that Petitioner never *did* become a gang member. The Court applies *Strickland*'s strong presumption of competence to trial counsel's advocacy here. *See Cullen v. Pinholster*, 563 U.S. 170, 196 (2011) (holding that the presumption requires courts to not only extend counsel the benefit of the doubt, but "to affirmatively entertain the range of possible" reasons for counsel's actions).

The Court notes that the evidence of Petitioner's guilt and propensity for future violence was overwhelming and practically established as a matter of law by the monstrous details of his capital offense, the testimony regarding his long history of domestic violence, and his pretrial jailhouse assault on another inmate. The jury also had its own opportunity to examine firsthand

---

[56] 46 R.R. 32-33.
[57] *See, e.g.*, 44 R.R. 177, 224-25; 45 R.R. 113-14.

Petitioner's demeanor and professions of remorsefulness. Under these circumstances, the Court similarly finds no reasonable probability that, but for trial counsel's inappropriate comments, the outcome in Petitioner's capital murder trial would have turned out any different.

The Court independently concludes that the comments in question did not rise above the level of harmless error. *See Brecht v. Abrahamson*, 507 U.S. 619, 623-24 (1993) (the test for harmless error in federal court is "whether the error had a substantial and injurious effect or influence in determining the jury's verdict"). Under *de novo* review, then, this claim also fails to satisfy the prejudice prong of *Strickland* necessary for federal habeas relief.

> ix.   Cumulative Ineffective Assistance

Petitioner also tacks on a conclusory cumulative IAC claim as part of his second claim in the Amended Petition.[58] The cumulative error doctrine requires a showing that constitutional error occurred during the petitioner's state court trial. *See Young v. Stephens*, 795 F.3d 484, 494 (5th Cir. 2015) (holding that a petitioner fails to satisfy cumulative error doctrine if the petitioner fails to demonstrate any constitutional error committed during trial); *Coble v. Quarterman*, 496 F.3d 430, 440 (5th Cir. 2007) (noting that cumulative error doctrine only affords habeas relief for errors that are of a constitutional dimension); *Miller v. Johnson*, 200 F.3d 274, 286 n.6 (5th Cir. 2000) (explaining that absent constitutional error, there is nothing to cumulate). Cumulative error doctrine does not provide federal habeas relief unless the constitutional error "so infected the entire trial that the resulting conviction violate[d] due process." *Derden v. McNeel*, 978 F.2d 1453, 1454 (5th Cir. 1992) (cleaned up); *Jackson v. Johnson*, 194 F.3d 641, 659 n.59 (5th Cir. 1999).

For the reasons discussed above, all of Petitioner's complaints regarding the performance of trial counsel fail to satisfy the prejudice prong of *Strickland*. All but one of these IAC claims

---

[58] Amend. Pet. at 94-96.

fail to satisfy the deficiency prong of *Strickland*. Thus, under the cumulative error doctrine recognized in the Fifth Circuit, there is nothing for the Court to cumulate. "Twenty times zero equals zero." *Derden*, 978 F.2d at 1458 (quoting *Mullen v. Blackburn*, 808 F.2d 1143, 1147 (5th Cir. 1987)). The Court therefore finds that, even under *de novo* review, Petitioner's cumulative IAC claim is without arguable merit and unwarranting of federal habeas relief.

Accordingly, the Court holds that claims two, three, and five do not entitle Petitioner to habeas relief from his conviction and sentence insofar as they allege ineffective assistance of trial counsel and should therefore be **DENIED** to that same extent.

### 7. Ineffective Assistance of Direct Appellate Counsel (Claims Three & Four)

The third and fourth claims of the Amended Petition allege that direct appellate counsel rendered ineffective assistance in violation of Petitioner's Sixth and Fourteenth Amendment rights.[59] Petitioner specifically contends that on direct appeal, appellate counsel failed to raise a point of error challenging the state trial court's exclusion of video-recorded interviews between Petitioner and various members of the media, as well as the full eight-hour video of Petitioner talking to himself, repeatedly denying responsibility for his capital offense, and sleeping soundly following his arrest. Petitioner also maintains that appellate counsel failed to present the entire seven-minute version of the Exhibit 84A recording as part of the state appellate record.

#### i.   Legal Standard

*Strickland*'s two-pronged approach to evaluating IAC claims against trial counsel applies to the performance of direct appellate counsel as well. *See Smith v. Robbins*, 528 U.S. 259, 285 (2000). Thus, the standard for evaluating the performance of counsel on appeal requires an inquiry into: (i) whether appellate counsel's performance was deficient, i.e., objectively unreasonable

---

[59] Amend. Pet. at 97-103.

under the then-current legal standards; and (ii) whether appellate counsel's allegedly deficient performance "prejudiced" the petitioner, i.e., a reasonable probability that, but for the deficient performance, the petitioner would have prevailed on appeal. *Id*. Where, as here, appellate counsel presented, briefed, and argued one or more nonfrivolous grounds for relief on direct appeal and did not seek to withdraw his representation, the petitioner must satisfy *both* prongs of the *Strickland* test in connection with his IAC claim against appellate counsel. *See Roe v. Flores-Ortega*, 528 U.S. 470, 477, 482 (2000) (holding the dual prongs of *Strickland* apply to claims of IAAC and recognizing that in cases involving "attorney error," the claimant must show prejudice); *Smith v. Robbins*, 528 U.S. at 287-89 (holding that petitioner must satisfy both prongs of *Strickland* to succeed on an IAAC claim for failure to file a merits brief).

Appellate counsel need not and should not raise every nonfrivolous claim or argument in merits briefing on appeal. *Id.* at 288; *Jones v. Barnes*, 463 U.S. 745, 751-53 (1983). Rather, effective appellate counsel should select from among them so as to maximize the likelihood of success on appeal. *Davila v. Davis*, 582 U.S. 521, 533 (2017); *Smith v. Murray*, 477 U.S. 527, 536 (1986). This process of winnowing out weaker issues and focusing on those more likely to prevail on appeal is the hallmark of effective appellate advocacy. *Id.*; *Jones v. Barnes*, 463 U.S. at 751-52. Appellate counsel's decision not to raise a claim or argument on direct appeal, therefore, does not give rise to deficient performance unless that claim or argument was plainly stronger than those actually presented to the appellate court. *Davila*, 582 U.S. at 533; *Smith v. Robbins*, 528 U.S. at 288. "In most cases, an unpreserved trial error will not be a plainly stronger ground for appeal than preserved ones." *Davila*, 582 U.S. at 533.

    ii.    <u>Deficient Performance Regarding Defense Exhibits 81A-84A</u>

For the reasons discussed at length in Section III(A)(1)-(6) of this opinion, the Court concludes there is no reasonable probability that, but for the failure of appellate counsel to challenge the state trial court's exclusion of the videos in Defense Exhibits 81A-84A and to offer Defense Exhibit 84A into the state appellate record, the outcome of Petitioner's direct appeal would have turned out any differently than it did. *See Smith v. Robbins*, 528 U.S. at 285. The videos in question depict Petitioner giving multiple self-serving interviews with local media, and spending eight hours in police custody denying that he killed four people and self-muttering in isolation.[60] The state courts reasonably concluded that the exclusion of these videos was harmless at best, and the Court agrees. *See Wells*, 611 S.W.3d at 409-23. The Court further concludes that in all reasonable likelihood, requiring a jury to watch the entire eight-hour recording of Petitioner refusing to confess his murder culpability—followed by hour after hour of Petitioner muttering to himself alone—as well as each of Petitioner's self-promotional media appearances, would have had the counterproductive effect of alienating that jury away from the defense. It certainly impacted the Court in such a way here. And it is very unlikely that any jury would have had the patience to stomach watching Petitioner's exercise in self-absorption any more than did this Court. As a result, Petitioner's IAAC claims fail to satisfy the prejudice prong of *Strickland* and thereby fail to warrant federal habeas relief.

Accordingly, the Court holds that claims three and four do not entitle Petitioner to habeas relief from his conviction and sentence insofar as they allege ineffective assistance of direct appellate counsel and should therefore be **DENIED** to that same extent.

### 8.  Ineffective Assistance of State Habeas Council (Claim Three)

The third claim of the Amended Petition also alleges that state habeas counsel rendered

---

[60] D.X. 81A-84A.

53

ineffective assistance.[61] Specifically, Petitioner contends that state habeas counsel failed to ensure that the entire seven-minute version of the Exhibit 84A recording was made a part of the record during Petitioner's initial post-conviction relief proceeding, rather than the four-minute version actually entered into the state habeas record. The Court finds this IAC claim to be legally frivolous.

AEDPA statutorily precludes allegations of ineffective assistance of state post-conviction counsel from serving as a basis for federal habeas corpus relief. *See* 28 U.S.C. § 2254(i). Infirmities in a state post-conviction proceeding, including ineffective assistance of state habeas counsel, do not furnish an independent basis for federal habeas corpus relief. *Gilkers v. Vannoy*, 904 F.3d 336, 346 n.60 (5th Cir. 2018). The Fifth Circuit has consistently applied this rule in various contexts. *See, e.g.*, *Haynes v. Quarterman*, 526 F.3d 189, 195 (5th Cir. 2008) (rejecting alleged ineffective assistance by initial state habeas counsel); *Elizalde v. Dretke*, 362 F.3d 323, 331 (5th Cir. 2004) (noting that Supreme Court precedent does not recognize a general right to effective assistance in state post-conviction proceedings); *Morris v. Cain*, 186 F.3d 581, 585 n.6 (5th Cir. 1999) (explaining that an attack on a state habeas proceeding is an attack on a proceeding collateral to the detention and not the detention itself, and thus does not furnish a basis for federal habeas relief).

Very simply then, Petitioner's IAC challenge to state habeas counsel proffers no cognizable claim for federal habeas relief. It is vacuous of arguable merit under a *de novo* standard of review.

Accordingly, the Court holds that claim three does not entitle Petitioner to habeas relief from his conviction and sentence insofar as it alleges ineffective assistance of state habeas counsel and should therefore be **DENIED** to that same extent.

Altogether, the Court holds that claims two, three, four, and five do not entitle Petitioner to habeas relief from his conviction and sentence and should therefore be **DENIED**.

---

[61] Amend. Pet. at 97-102.

### 9.   Request for Continuation of Stay of Execution

At the end of the Amended Petition for a writ of habeas corpus, Petitioner makes a cursory request for the Court to grant a continuation of a stay of execution.[62] But there currently does not exist a pending execution date for Petitioner. As such, there currently does not exist a stay of Petitioner's execution, either. The Court itself has not entered a stay of execution up to this point in time despite its jurisdiction to do so. *See McFarland v. Scott*, 512 U.S. 849, 859 (1994). Nevertheless, the Court is unaware of—and the Amended Petition does not proffer—any valid basis for entering one at this point in time.

Accordingly, the Court holds that this request does not entitle Petitioner to a continuation of a stay of execution and should therefore be **DENIED**.

### 10.  Request for Federal Evidentiary Hearing

In a similar vein, Petitioner buries another perfunctory request at the bottom of the Amended Petition that prays for the Court to grant a federal evidentiary hearing.[63] With respect to any new factual allegations, evidence, or legal arguments Petitioner advances pursuant to claims receiving *de novo* review, the Court finds that Petitioner is not entitled to an evidentiary hearing in these federal habeas proceedings.

The Court has already undertaken *de novo* judicial review of all of Petitioner's claims contained in the Amended Petition. In the course of that review, with the exception of assertions refuted by the state court records now before it, the Court assumed the factual accuracy of: (i) all specific facts alleged by Petitioner in support of his claims; and (ii) any documents Petitioner presented in support of his claims. And yet despite the exceptionally broad scope of the Court's

---

[62] Amend. Pet. at 118.
[63] Amend. Pet. at 118.

federal habeas corpus review here, it has independently concluded that none of Petitioner's claims possess any arguable merit.

When the truth of every novel factual allegation in support of a petitioner's claims is assumed and the claims are still unwarranting of federal habeas relief, the petitioner is not entitled to a federal evidentiary hearing, either. *See Schriro v. Landrigan*, 550 U. S. 465, 474 (2007). A petitioner lacks entitlement to an evidentiary hearing in federal habeas proceedings with respect to every claim that the Court reviews and denies under a *de novo* standard. *Richards v. Quarterman*, 566 F.3d 553, 563 (5th Cir. 2009) (quoting *Schriro*, 550 U.S. at 373)). It should also be made clear that a criminal trial "is the 'main event' at which [Petitioner's] rights are to be determined, and the Great Writ is an extraordinary remedy that should not be employed to 'relitigate state trials.'" *McFarland*, 512 U.S. at 859 (internal citation omitted).

Here, an exhaustive review of the pleadings and state court records has led the Court to conclude that Petitioner is barred from obtaining a federal writ of habeas corpus pursuant to any of the claims set forth in his Amended Petition. From that conclusion, the Court finds that Petitioner is likewise without any entitlement to an evidentiary hearing in this federal habeas court. *See Richards*, 566 F.3d at 563. The Court refuses to enter into the business of relitigating Petitioner's entire state capital murder trial under the guise of a federal habeas proceeding. *See McFarland*, 512 U.S. at 859.

Accordingly, the Court holds that this request does not entitle Petitioner to a federal evidentiary hearing and should therefore be **DENIED**.

### 11. Request for Federal Discovery

Petitioner tacks on yet another cursory request to the very bottom of the Amended Petition

56

for a writ of habeas corpus—this time for the Court to grant full federal discovery on the matter.[64]

Under Rule 6 of the *Rules Governing Section 2254 Cases in the United States District Courts*, discovery is permitted in a federal habeas proceeding upon a finding of "good cause." *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997); *Murphy v. Davis*, 901 F.3d 578, 590 (5th Cir. 2018) (when specific allegations before a federal habeas court establish a reason to believe that the petitioner may, if facts are fully developed, demonstrate his entitlement to relief, the petitioner may be entitled to discovery); *Jones v. Davis*, 890 F.3d 559, 573 (5th Cir. 2018). On the other hand, federal habeas courts need not allow fishing expeditions. *Murphy*, 901 F.3d at 590; *United States v. Webster*, 392 F.3d 787, 802 (5th Cir. 2004). And it is especially worth reiterating that a state criminal trial "is the 'main event' at which [the petitioner's] rights are to be determined," whereas a federal writ of habeas corpus is "an extraordinary remedy that should not be employed to 'relitigate state trials.'" *McFarland*, 512 U.S. at 859 (internal citation omitted).

Here, Petitioner's allegations are nowhere near the universe of "good cause." The Court has already undertaken *de novo* review of every constitutional claim underlying the Amended Petition, including all novel factual allegations, evidence, and legal claims submitted by Petitioner in support of same. In doing so, the Court has treated as factually accurate all specific factual allegations in the Amended Petition that the state trial and habeas corpus record do not otherwise refute. Yet despite the exceptionally broad nature of the habeas corpus review undertaken here, the Court still arrived at the conclusion that all claims contained within the Amended Petition not only lack merit but are bereft of any potentially arguable merit, too. There are no facts that require even more development beyond the thousands of pages of briefing and evidence that have already been thoroughly developed through multiple state capital murder and post-conviction proceedings

---

[64] Amend. Pet. at 118.

leading up to federal habeas corpus.

The Court therefore has no business entertaining Petitioner's dubious invitation to embark on a fishing expedition for mitigating or exculpating evidence that simply does not exist. *See Murphy*, 901 F.3d at 590; *Webster*, 392 F.3d at 802. If otherwise, the Court would be effectively reopening and relitigating Petitioner's state criminal trial through federal habeas just so that he may have an extra bite at the apple for a lesser sentence. *See McFarland*, 512 U.S. at 859. Under these circumstances, Petitioner is far from entitled to opening federal discovery at this juncture.

Accordingly, the Court holds that this request does not entitle Petitioner to federal discovery and should therefore be **DENIED**.

*     *     *

The Court concludes that all of Petitioner's underlying claims and requests for federal habeas relief fail on the merits. In view of that conclusion, the Court holds that the Amended Petition for Writ of Habeas Corpus (ECF No. 58) should be and is hereby **DENIED**.

### B.  MOTION TO STAY PROCEEDINGS

A stay and abeyance to permit exhaustion of state court remedies on unexhausted claims for relief is not appropriate in the context of a pending federal habeas corpus proceeding unless a district court determines that: (1) there is "good cause" for the petitioner's failure to exhaust his claims in state court; (2) the unexhausted claims are not plainly meritless; and (3) the petitioner has not engaged in abusive litigation tactics or intentional delay. *Rhines v. Weber*, 544 U.S. 269, 277-78 (2005); *Haynes v. Quarterman*, 526 F.3d 189, 196 (5th Cir. 2008).

Here, all of Petitioner's claims for habeas corpus relief are plainly meritless. As explained at length above, the Court has undertaken *de novo* review of every constitutional claim underlying the Amended Petition, including all novel factual allegations, evidence, and legal claims submitted

by Petitioner in support of same. The Court has treated as factually accurate all specific factual allegations in the Amended Petition that the record from Petitioner's state trial and habeas corpus proceedings do not completely refute. The Court nonetheless concluded that all claims contained within the Amended Petition not only lack merit but are bereft of any arguable merit as well. So too under these circumstances, Petitioner is likewise not entitled to a stay of the proceedings, either.

Based on the foregoing, the Court holds that the Motion to Stay Proceedings (ECF No. 60) should be and is hereby **DENIED**.

### C. CERTIFICATE OF APPEALABILITY

Under AEDPA, the petitioner must obtain a Certificate of Appealability ("CoA") before appealing the denial of a writ of habeas corpus petitioned under § 2254. *Miller-El*, 537 U.S. at 335–36; 28 U.S.C. § 2253(c)(2). A CoA is granted or denied on an issue-by-issue basis, limiting appellate review of a habeas corpus petition to those specific issues on which a CoA is granted. *Crutcher v. Cockrell*, 301 F.3d 656, 658 n.10 (5th Cir. 2002); 28 U.S.C. § 2253(c)(3). A grant of a CoA shall not warrant unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282 (2004). To clear this persuasive hurdle, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

Here, Petitioner falls well short of demonstrating that reasonable minds would disagree with the Court's conclusion that each and every one of the constitutional claims underlying the Amended Petition are meritless. The Court therefore concludes that Petitioner is not entitled to a CoA on any of the issues presently before it.

In light of the foregoing, the Court holds that a Certificate of Appealability (ECF Nos. 80, 81) should be and is hereby **DENIED** for all claims and issues before the Court.

## IV.    CONCLUSION

Accordingly, it is **ORDERED** that the Amended Petition for Writ of Habeas Corpus (ECF No. 58), the Motion to Stay Proceedings (ECF No. 60), and the Certificate of Appealability (ECF Nos. 80, 81)—as well as all relief prayed therein—are hereby **DENIED**.

**SO ORDERED** on this **2nd day** of **November, 2023**.

_Reed O'Connor_
**UNITED STATES DISTRICT JUDGE**

60